Pardee, Circuit Judge.
With the appellant were joined as defendants, in the court below, the trustees of the internal improvement fund of the state of Florida, and William Clark. As these last-named defendants were not substantially affected by the decree of the court below, they did not join in the appeal. Severance being had as to defendant Clark, the railroad company alone appealed.
The Augusta, Tallahassee & Gulf Railroad Com pan}’ was chartered by the legislature of the state of Florida to construct a railroad from the city of Carrabelle, on the Gulf, of Mexico, to the Georgia state line, by way of Tallahassee, and thence onwards to the city of Augusta, Ga., under a charter obtained from the last-mentioned state,—a distance of about 300 miles. The legislature of the state of Florida granted the railroad company 15,000 acres of land per mile, of the lands donated to the state under the swamp and overflowed lands act, enacted by congress in 1850. Prior to the matters giving rise to the present suit, the company had constructed and equipped 11$ miles of its line, from the gulf to a point on the west bank of the Ocklocknee river, for which they had received, under the land grant aforesaid, a certificate (No. 13,909) entitling the company to 108,971 acres of swamp and overflowed lands. Under the charter of the company, the board of directors was to be composed of nine stockholders, each the bona fide owner of not less than five shares of the stock of the company. On May 24, 1889, there seemed to be but seven directors,—Henry A. Blake, R. B. Symington, Charles M. Zeh, William Clark, W. Campbell Clark, Henry Gamble, and Robert Cumming. Of these seven directors, Blake was president; William Clark, the purported capitalist of the company; and the other five, apparently, representatives of William Clark’s interest,—all but Dr. Zeh being his clerks and partners, and Dr. Zeh, his family physician. Such of them as were examined on the hearing of this case showed by their testimony that they were, in the main, perfunctory directors, following the lead and wishes of William Clark.
In this state of the directory, on May 24,1889, the record shows that a stockholders’ meeting and a meeting of the board of directors were held. At the stockholders’ meeting, so far as the evidence in this case discloses, the following proceedings were had:
“A meeting of tlie stockholders of the Augusta, Tallahassee & Gulf Railroad was held at No. 400 Broadway, this day, at 3 o’clock P. m., pursuant to adjournment; a majority of all the stockholders being present. First, referring to the bonding of some of the property of the railroad company, the following resolution was-presented and unanimously adopted, to wit: ‘And, for the purposes aforesaid, the board of directors are also empowered to dispose of and sell all the said bonds, or any part of them, and also to dispose of and sell any of the capital stock of this company not already issued and subscribed for, in such manner as the board may deem to be expedient for the best interests of the company; or, in case the board should deem it expedient for the best interests of the company to sell, pledge, mortgage, or otherwise use the whole or any part of the lands now owned or coming unto this company from and under the said land grant from the state of Florida, or in any other manner than as heretofore authorized, either permanently or témpora *65 rily, they are empowered so to do. Resolved, that resolutions or parts of resolutions inconsistent herewith are hereby rescinded and annulled.”’
The board of directors, at their meeting, (whether one continuous meeting or in adjourned sessions does not appear,) resolved as follows:
“New York, May 2-1, 1889, a meeting of the board of directors of the Augusta, Tallahassee & Gulf Railroad Company was held at No. 400 Broadway, this day, at 4 o’clock p. m., pursuant to adjournment; a majority of the board being present. First, reciting and providing for carrying out provisions in the resolutions of the meeting of the stockholders of the same date, it is further provided, in the event, however, that the president should at any time deem it expedient to negotiate, sell, pledge, mortgage, or otherwise use the whole or any part of the lands now owned or coming to this company from and under the before-mentioned land grant from the state of Florida, and in any other manner and form than as heretofore authorized, either permanently or temporarily, he is hereby empowered, in his discretion, so to do; and the proper executive oflicers of the company are hereby empowered and instructed to execute and deliver any necessary and proper papers, and to do any and all proper and necessary things, under the direction of the president, to carry this provision into effect. The president is further authorized and empowered to make or to cause to be made any contract for the construction and equipment of the proposed line of road of this company from its present terminus to Augusta, Georgia, or any part of it, together with all things usual, necessary, incident thereto, upon such terms and conditions as he deems best, and to therein contract for the payment or sale of any or all said bonds, stock, and lands.”
It further appears, from the same record of proceedings, that the following resolution was presented and unanimously adopted, to wit:
“Resolved, that William Bailey,'of St. Louis, Mo., be and hereby is elected a member of this board, to fill one of the vacancies now existing, and also that said Bailey be and hereby is elected to be vice president of this company, to fill the existing vacancy. ”
On the same day a resolution was passed, authorizing the president to appoint a general manager of the company, and to fix his salary. On May 28,1889, four days following, the president of the company, Blake, negotiated and executed a construction contract with one Frank M. Green, represented by his attorney in fact, William Bailey, for the construction of the road. By the terms of the contract, Green was to be paid for constructing the railroad to Augusta, in bonds and shares of the company, to wit, $16,000 first mortgage bonds, $7,000 second mortgage land-grant bonds, and $20,000 stock of the company, for each completed mile. William Bailey, the newly-elected vice president, not only appears as attorney for said Green in the said construction contract, but for the sum of one dollar, and other valuable considerations, he guarantied the performance of the contract on the part of Green. This construction contract was signed by the Augusta, Tallahassee & Gulf Railroad Company, by Henry A. Blake, president, John L. Rooney, secretary, with the seal of the company attached. After the making of the said contract, it appears the president, Blake, appointed Contractor Green assistant general manager of the company.
About the middle of September following, the appellee, Joseph J. *66 Kittel, something of a capitalist, according to his own evidence, became interested in the affairs of the company. According to the evidence, about the time mentioned, he was approached by a broker to loan money, and was by him (the broker) introduced to Bailey, vice president, and afterwards to Blake, president. The result of the negotiation was that, on the 18th of September, Kittel loaned the railroad company the sum of $25,000, receiving as evidence thereof three several promissory notes, wherein the said company promised to pay to Kittel, or his order, the aforesaid sum of $25,000, with interest from the date of the loan at 5¾ per cent, per annum, in gold coin of the United States, at its then standard value, in the amounts and at the times specified, that is to say: One note for $10,000, payable 6 months after date, with interest aforesaid from September 18, 1889; one note for $7,500, payable 7 months and 10 days after date, with interest aforesaid from October 28, 1889; and one note for $7,500, payable 8 months and 10 days after date, with interest aforesaid from November 27, 1889. To secure the payment of the said several promissory notes and the said sum of $25,-000, with the interest to accrue thereon, the railroad company executed and delivered to Kittel a mortgage of the 109,000 acres of land .heretofore referred to. Said mortgage contained various provisions, not necessary to recapitulate.
This transaction was entered into on the part of Kittel under the advice of counsel, after an examination of the books and records of the company in regard to the power and authority of Blake, president, to make the loan and execute the mortgage. The evidence shows that the said sum of $25;000 was paid over, according to the contract, in four different checks drawn by Kittel, on the Union Trust Company, to the order of the railroad company, Blake, president, indorsing for $10,000, and M. W. Hayward, assistant treasurer, for $15,000, thereof. On the same day that the notes and mortgage were executed, and as a part of the same transaction, an agreement was entered into between Frank M. Green, of Kansas City, Mo., represented by William Bailey, his attorney in fact, William Bailey, individually, and Henry A. Blake, of the city of New York, parties of the first part, Joseph J. Kittel, of the city of New York, party of the second part, and the Augusta, Tallahassee & Gulf Railroad Company, party of the third part. This contract recited that, in consideration of the loan that day made by Kittel to the railroad company, of $25,000, and as an additional inducement to and simultane■ously with the making of the loan aforesaid, the parties of the first part, •claiming to be the only persons who had any interest in or right to the •construction contract hereinbefore referred to, transferred and set over to the said Kittel, party of the second part, one tenth interest in the con-struction contract made between the railroad company and Green on the 28th day of May, 1889. The party of the third part, the railroad company, stipulated in said contract to retain one tenth of each and every one of the installments due and to grow due to the said Frank M. Green, or his assigns, by virtue of the agreement for the construction of the railroad, until such time or times as the said party of the second part *67 shall, by written instrument to that effect, prescribed by him, consent to such payment; it being stipulated in the said contract that, while the said Kittel was to receive one tenth of the proceeds of the said contract, from the said one tenth was to be deducted one tenth of the actual cost of construction.
About the time of the making of the aforesaid mortgage and contract, it seems that the president, Blake, appointed Joseph J. Kittel land commissioner, although there is no direct proof of the same in the record; and thereafter it appears that Kittel went to Europe, according to his testimony, on private business. During his absence, and on October 30th, at an informal meeting, in which the Clark directors participated, Kittel was chosen a director of the railroad company. On his return, December 14, 1889, he was served with a notice of such election as director. It does not appear that he was a stockholder in the company, and eligible as a director, that he accepted the appointment, or ever in any way acted as a director of the railroad company; and on February 14, 1890, he tendered his resignation, in a communication, under the advice of counsel, as follows:
“Robert Cumming, Esq., Secretary and Treasurer, &c.—Dear Sir: There being some doubt in my mind whether I am a director and ‘ general land commissioner’ in your railroad, in order to clear the matter, I hereby tender my resignation as director and ‘ general land commissioner,’ in the Augusta, Tallahassee and Gulf Railroad Company, the same to take effect immediately.
“Yours, etc., J. J. Kittel.”
In December, 1889, during Mr. Kittel’s absence in Europe, the mortgage granted to him by the railroad company was recorded in different counties in Florida in which the land lay, by the direction of Kittel’s attorney, Judge Bischoff, on a report from Bailey that Blake, president, in connection with others, was depredating on the lands. On January 25, 1890, the said Kittel made another loan to the railroad company, of $4,450, on a promissory note payable 52 days from the date thereof, with interest at 5! per cent., and by writings made the same day the railroad company granted Kittel a further mortgage upon the 109,000 acres of land aforesaid; and President Blake, Frank M. Green, and William Bailey, in consideration of the loan of $4,450, transferred to said Kittel an additional interest of one twentieth in the construction contract; the railroad company, by Blake, president, appearing in the contract, and guarantying and stipulating to hold one twentieth of the proceeds of the construction contract, less the one tenth cost of actual construction, to the account of said Kittel. The mortgage granted at this time appears to have been duly recorded in Florida, February 3, 1890.
On March 18, 1890, the note due in six months by the contract of September 18, 1889, fell due; and under the stipulations of the mortgage the company had the right to renew the same. This appears to have been done by the payment of the interest due on the part of the company, and the execution of a new note in the sum of $10,000, payable in six months from date; and on the same day the note for $4,450 *68 fell due, and was renewed, under the terms of the mortgage, for a period of six months, by the company paying the interest to that date, and executing the proper writing. April 28, 1890, the note for $7,500, secured by the first mortgage, falling due in 7 months and 10 days from date, fell due, and was renewed, and a new note given by the railroad company, Blake, president. And, again, on May 28, 1890, the note for $7,500, secured by the first mortgage, due in 8 months and 10 days from date, was likewise renewed, on the payment of interest and the execution of a new note. All the renewal notes secured by both first and second mortgage were at maturity unpaid, and were duly protested; the last one on the 1st day of December, 1890. In March, 1890, on account of differences between Blake and Bailey, the said Frank M. Green threw up and abandoned the construction contract, and notified the company of his inability to comply with and carry out the contract; and, about April 12th, Bailey resigned as a director, vice president, and general manager of the defendant company. And in September following the following proceedings appeared to have been had:
“At a meeting oí the board of directors September 11,1890, at the office of the company, 10 Wall street, at 1 p. m., pursuant to adjournment,—present: H. A. Blake, R. B. Symington, Chas. M. Zeh, Jno. E. Jarvis, Wm. Sheriff, and Henry Gamble,—on motion of R. B. Symington, seconded by Mr. Henry Gamble, Mr. Chas. M. Zeh was duly and unanimously elected president of this company. M. W. Hayward offered his resignation as assistant secretary, which, upon motion made and carried, was duly accepted.”
At a meeting of the board of directors held at New York on November 17, 1890, at which were present directors Zeh, Symington, Cumming, Jarvis, Gamble, and Sheriff, it was resolved that—
“ The purported records of meetings of this board, contained on pages 6, 7,8, and 64 of the record books be, and the same are, hereby disapproved, annulled, and declared void and of no effect.”
The records of the meetings thus rescinded include a part of the proceedings of the board of directors held on May 24, 1889, in which authority was given to the president to mortgage the land grant, and to make a contract for the construction and equipment of the road.-
In July, 1891, Kittel filed his bill for foreclosure of the aforesaid mortgage. In addition to proper averments, setting forth the issuance of the notes and the granting of the mortgages and default, he averred that one William Clark claimed to have a judgment at law, entered on default, against the said railroad company, in the sum of $432,228.42, which, it was averred, said Clark claimed as a lien on said property, covered by the mortgage prior thereto. The prayer of the bill was for an account as to the amount due upon the promissory notes given by the railroad company to Kittel, the foreclosure of the mortgage given to secure the said notes, and the sale of the property described in the mortgage; for a decree against William Clark, postponing his alleged lien to that of the 'mortgage, and an injunction restraining him from selling or attempting to sell any of the lands mentioned and described in the mortgage, in satisfaction of his judgment. The railroad company and William Clark *69 appeared, and severally filed demurrers to the bill, for want of equity, and because, according to the bill, the title to the land in which the mortgage is sought to be adjudged is in the United States, and also because the title to the land upon which the mortgage lien is sought to be adjudged and enforced is in the state of Florida. These demurrers, after hearing, were overruled by the court, and thereupon Clark and the railroad company filed separate answers, substantially setting up the same facts, denying the indebtedness to complainant, admitting the company’s ownership to the tract of land described in the mortgage, denying the recording of the mortgage, setting forth the construction contract between the railroad company and Frank M. Green, and averring that Green was a brother-in-law of Bailey; that, at the time of the execution of the contract, Bailey was a director and vice president and general manager of the company,—and, upon information and belief, charging that Blake, president, and Bailey, vice president, were secretly and jointly interested in the construction contract with Green, for a division of the inordinate profits of the same between themselves and such other persons as might thereafter become associated with them; that all the negotiations resulting in said contract were conducted by the said Blake and Bailey; that the said Bailey was really the contractor, and was known to be such by the said Blake; that the agreement between Bailey, Blake, and Green for division of the profits of the construction contract was entirely unknown to the other directors and officers of the defendant company, and .remained unknown to them until after a copy of the agreement made between the complainant, "Kittel, Bailey, Blake, and Green was furnished to counsel, after the resignation of Blake, president, in November, 1890; that there was a fraudulent and corrupt combination between Kittel, Bailey, Green, and Blake, to loan money to the railroad for the use of the construction company, and at the same time to retain possession of the land grant; that in pursuance of such combination the notes and mortgages and agreements were executed; that part of the $25,000 advanced by Kittel under the contract was paid to Blake, and by him paid to Bailey and Green in carrying out their contract for constructing the defendant’s railroad, and that some of the money was received by the said complainant, Kittel, and the said Bailey, on a claim for brokerage; that the resolutions alleged as having been passed at the meeting of stockholders, and approved by a meeting of the directors, authorizing the mortgage of the land grant, were never passed or approved by any meeting of the directors; that the person who signed the said mortgage and agreements as assistant secretary of the company, and attached the seal of the company thereto, was not the secretary of the company, and had no authority to.act as the secretary; that the said notes and mortgage set forth in the bill of complaint were without the authority and knowledge of the directors, stockholders, or officers of the defendant company, except Blake, Kittel, Bailey, and Green, and are void and of no effect.
The answers further allege that in March, 1890, the said Frank M. Green abandoned the construction contract, and notified the company *70 of his inability to comply with and carry out the same, and about the same time Bailey resigned as director, and afterwards, in the month of September, Blake resigned as director and president, and thereupon Charles M. Zeh was chosen president of the company, and that the company was greatly damaged, and its credit ruined, by the actions and doings of the alleged copartners, Kittel, Bailey, Blake, and Green, in their reckless conduct of the management of the defendant company’s interest, and the total failure to construct the defendant’s road, and in the pretended incumbrance placed upon the defendant company’s land grant, for their own selfish uses and purposes.
The decree in the court below was in favor of the complainant, recognizing and foreclosing the mortgages sued on, finding the sum of $33,-270.86 due, ordering the company to pay within a short day, and, in failure thereof, that the mortgaged property be sold, after public advertisement, by a special master of the court.
The railroad company, in bringing the case to this court, assigns the following errors: (1) The court erred in overruling the demurrer interposed to the bill of complaint herein by the said defendant; (2) the court erred in rendering a decree against the above-named defendant.
The demurrer interposed by the defendant railroad company states the inconsistent propositions that the legal title to the lands mortgaged is in the United States and also in the state of Florida. The counsel for the company contends in this court that the bill shows the legal title' to the lands sought to be sold to be in the United States, and claims- that what passed under the grant of 1850 was the legal title to swamp and overflowed lands, and what were and what were not swamp and overflowed lands was a question of fact, to be hereafter determined, when the question should be raised in the courts, upon proofs submitted; and he further contended that the certificate of the trustees guarded the United States upon this point, and that the company received its certificate upon the express condition mentioned, and that the company, as well as the mortgagee, are bound by it; and that, in order for the court to sell the lands under this decree, it must, by some form of proof, determine that the land is in fact swamp land, under the act of 1850. The appellee contends that the legal title to the land passed to the state by the act of congress of September 28, 1850, without any patent, citing Wright v. Roseberry, 121 U. S. 488-503, 7 Sup. Ct. Rep. 985; and further, as follows:
“By-the act of the legislature of Florida, January 6, 1856, this legal title passed to the board of trustees, defendants, who have not appealed from .the decree; and the trustees say in their answer they will convey to appellant the remainder of the lands as soon as they receive the patent. They could convey before. The legal title passed by the grant to every acre of land that is swamp and overflowed land, in point of fact. The appellant admits, by its mortgage, it is all swamp and overflowed land. The trustees admit, by their answer and exhibit thereto, it is swamp and overflowed lands, and are es-topped from and do not seek to controvert it. If at any future time the government of the United States should contend that any single piece of the one hundred and nine thousand acres is not swamp and overflowed land, it will *71 be time enough to settle that controversy, whenever it arises. The defendant company, the appellant here, cannot and has not raised any such question, in its answer. Apart from this, a mortgagor can never raise a question of title, and say it had no title, as against the mortgagee. The latter is entitled to have the property mortgaged sold to pay his debt, and the purchaser will get such title as the mortgagor holds. ”
In our opinion, if the company has not a legal title to the lands mortgaged, it had a full.equitable title. The language of the mortgages, in the granting part, is full and complete, conveying any and all interest of the railroad company in the lands, and passed whatever title the railroad company had. It was sufficient to mortgage land held by a full equitable title, as well as that held by a legal title. Railroad Co. v. Hamilton, 134 U. S. 296-305, 10 Sup. Ct. Rep. 546; Trust Co. v. Kneeland, 138 U. S. 414-419, 11 Sup. Ct. Rep. 357.
Whether the decree appealed from was correctly rendered in favor of the complainant, Kittel, depends upon the undisputed facts hereinbefore recited, and upon several contested propositions of law and fact, which may be stated and answered as follows:
1. Was M. W. Hayward the assistant secretary of the company from March 24, 1889, to September 11, 1890, and as such authorized to attach the séal of the company to the mortgages granted to complainant, Kittel? It appears that he was employed about the office of President Blake; that he was appointed by President Blake assistant secretary and assistant treasurer about February 1st, 1889; that up to the time of his resignation he acted as secretary, though signing as assistant secretary, transacting the business of the company, with the knowledge of most if not all of the directors, and that in fact he transacted all the business of the secretary during the time mentioned. It is not necessary to determine whether he was an assistant secretary de jure, since it clearly appears that with the consent and knowledge of the president and board of directors, during the time mentioned, he was de facto secretary of the company.
2. Whether the board of directors authorized the president, Blake, to borrow money for the uses of the company, and to mortgage the land grant of the company to secure the repayment of sums borrowed. The minutes of the board, kept by Hayward, as secretary, show a resolution to that effect, passed at a meeting held on the 24th day of May, 1889. Other proceedings had that day, at the reported meetings of the board of directors, are undisputed, such as the appointment of Bailey as director and vice president; the authorization of the president to make a contract for the construction and equipment of the proposed line of the road to Augusta, Ga.; to authorize the president to appoint a general manager,—the minutes of all of which were recorded by Hayward, while the stockholders’ meeting reported to have been held the same day is disputed. That it was not held, is not proved. The record book does not appear to have been produced in evidence. The extracts given from it are not in chronological order, or as in any wise attempting to give an insight into the manner in which the book was kept. Whether *72 the resolution authorizing the president to mortgage the lands granted by the state of Florida was passed, depends upon the credit given the testimony of Directors Robert Cumming, William Henry Gamble, Robert B. Symington, Charles M. Zeh, and William Clark, which testimony is negative,—not recollecting the meeting,—rather than positive,—recollecting that no such resolution was passed.
3. Was Kittel a director of the company? There is no doubt he-was elected at an informal meeting, during his absence- in Europe; that he was notified in writing of the appointment very soon after his return; and that, about two months .thereafter, he resigned as director. He was not the owner of any stock in the company, and was therefore ineligible. He never in any wise acted as director, and his resignation was given under the advice of counsel, and in order to clear the matter of doubt, as to whether he was or was not a director.
4. Was Kittel acting in good faith in the loans he made to the company? The evidence shows that he acted under advice of experienced counsel, after a full examination of the records of the company as to the authority of the president to borrow on behalf of the company, and to give as security the mortgage on the land grant. There is no evidence whatever to show that he doubted the legality or honesty of the transaction; that he suspected the president’s authority to borrow, or his authority to grant the mortgage; or that, to his knowledge, the money was in any wise intended to be used otherwise than directly for the needs and benefits of the company; or that he had any idea that the money he loaned was money loaned to and for the benefit of the construction company, otherwise than as the construction company would be aided by funds in the hañds of the railroad company. The loan does not appear to have been in any wise secret, for even Mr. William Clark, the moneyed man of the concern, admits that he was informed by Blake of the loan, just after it was made. The only suspicion with regard to the bonafides of Kittel in the whole transaction arises from the fact that, as part of the consideration for loaning the company money at an extraordinarily low rate of interest, considering the enterprise and the security offered, Kittel was granted, in all, a three-twentieths interest in the construction contract. In our opinion, this circumstance is of small weight. The construction contract was authorized by the board of directors. They were charged with notice that Bailey, a director, was, at the making of the contract, interested in the same. President Blake’s interest, even if unknown to the board of directors, would not render the contract absolutely void, if otherwise free from fraud or undue advantage. This contract had been made for four months; was apparently in process of execution, with the knowledge of all concerned; and Kittel’s acceptance of an interest therein falls far short of showing that he was making himself a party to any contract or scheme to defraud or injure the railroad company. The construction contract, on its face, does not, as defendants Clark and the company claim, carry with it marks of extortion or fraud or bad faith, by reason of the compensation to be given for construction. In enterprises like the one then in hand, which seem to con *73 sist of building and equipping a railroad on the proceeds of land grants, subsidies from favored towns, and the sale of securities on the railroad to be built, the second mortgage bonds are nearly always rated at a nominal value, the stock is nominal, and only the first mortgage bonds are valued at anything near par. Certainly, no experienced financier would value $16,000 per mile first mortgage bonds, $7,000 per mile of second mortgage land-grant bonds, and $20,000 per mile of nominal stock, on a line of railroad to be built from the city of Carrabelle to Augusta, Ga., as worth in cash anything more than from sixteen to eighteen thousand dollars per mile.
At the date of contract the company had succeeded in constructing 11½ miles. How this construction ivas paid for—whether by mortgage bonds or sales of stock—does not appear; but the record does show that Mr. William Clark has recovered a judgment against the company, presumably for sums advanced for constructing that part of the road built at the date of the contract, for the sum of $432,228.42, which is at the rate of over $37,500 per mile.
5. As to the laches of the company. The evidence shows that the money loaned by Kittel was paid over to the railroad company, and used by the officers of the company for company purposes; that the knowledge of the first loan, of $25,000, was communicated to the principal director, Clark, a few days after the loan was made; that in December, 1889, about three months after its date, the mortgage was recorded in the state of Florida, and knowledge of that recordation was brought home to the directors other than Blake and Bailey. Until the answer was filed in this case, March 9, 1891, there was no repudiation of the loan and mortgage, no denial communicated to Kittel, on the part of the board of directors, of the authority of the president to execute the notes and grant the mortgage. True it is that in November, 1890, after Blake’s resignation as president, the directors, by resolution, rescinded the minutes of the meeting of May 24, 1889, so far as they showed a resolution authorizing the president to execute a mortgage of the Florida lands; but this action was not notified to Kittel, nor followed by any proceedings to nullify the mortgage or return the loan. In the mean time the company spent the money, and recognized the validity of the transaction by paying interest and renewing the notes, and Director Clark obtained, by default, his large judgment against the company.
On the whole case, it seems to us that as Kittel loaned his money and took the mortgages in good faith, as the company had the benefit of the safiie, as the directors and officers of the company, by permitting Blake, president, to manage and control the affairs of the company without oversight and scrutiny, and by neglect of their duties and responsibilities enabled Blake and Bailey to deceive Kittel, if he was deceived, and as the directors and officers, after discovering the loan by and mortgage to Kittel, failed to take prompt action of disaffirmance, and otherwise were guilty of laches, the transactions had between Kittel and the company should be treated as fully ratified on the part of the company.
In Indianapolis Rolling Mill v. St. Louis, etc., Railroad, 120 U. S. 256, *74 7 Sup. Ct. Rep. 542, it was held that where a board of directors, when notified of what had been done by their agents, did not disaffirm their action within six months, the disaffirmance came too late. This doctrine was affirmed in Pennsylvania Ry. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371-381, 9 Sup. Ct. Rep. 770, as follows:
“When the president of a corporation executes in its behalf, and within the scope of its charter, a contract which requires the concurrence of the board of directors, and the board, knowing that he has done so, does not dissent within a reasonable time, it will be presumed to have ratified his acts.”
And the same doctrine was again affirmed in Construction Co. v. Fitzgerald, 137 U. S. 109, 11 Sup. Ct. Rep. 36.
The decree appealed from should be affirmed; and it is so ordered.