UNITED STATES v. WEST SIDE IRRIGATING CO.

(District Court, E. D. Washington, S. D. January 29, 1916.)

No. 228.

1. CORPORATIONS &⟶513—CONTRACTS—AUTHORITY OF OFFICERS—PLEADING WANT OF AUTHORITY.

Want of authority in the officers of a defendant corporation to execute or authorize the execution of a contract relied upon by plaintiff as entitling it to the relief sought was a special defense, to be specially pleaded.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2017–2027, 2031–2034, 2036–2045; Dec. Dig. &⟶513.]

2. ESTOPPEL &⟶95—SILENCE—AUTHORITY OF OFFICERS.

The Secretary of the Interior having refused to approve a reclamation project, unless conflicting claims of appropriators of water from a river were adjusted, an irrigation company, diverting water from such river, executed an agreement limiting its claim to specified quantities. Though all of the stockholders knew of the contract, they did not disavow the authority of the officers to execute it, but maintained silence respecting the matter for almost two years, during which the government proceeded with the work and with a vast outlay of money. in the belief.that all disputes had been settled. *Held* that, by failure of the stockholders to disavow the unauthorized acts of the corporate officers and give notice of disavowal to the government, they and the corporation were estopped to question the authority of the officers or the validity of the contract.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 285–287; Dec. Dig. &⟶95.]

3. WATERS AND WATER COURSES &⟶158—CONTRACTS—LIMITING DIVERSION— CONSTRUCTION.

When a reclamation project was, under consideration, the Secretary of the Interior refused to approve the plan unless conflicting claims to wa-

ter from a river were adjusted, and local committees were appointed to obtain such an adjustment, at the instance of one of which committees an irrigation company signed an instrument reciting that a preliminary investigation showed that all the low-water flow of the river had been appropriated, that it would be necessary to store surplus waters of the flood season, and that no irrigation project by the government could be recommended as feasible unless the water to which each user was entitled was definitely agreed to, and providing that the company limited its claim to water to 80 cubic feet per second during certain months. *Held*, that as the object of the government was to fix the quantity of the water diverted from the river, and not the quantity actually used for irrigation purposes, the water was to be measured at the intake of the company's canal, where it was diverted from the river, and not at the various points where it was diverted from the canal by the various owners of land irrigated by the company.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 184, 186–188; Dec. Dig. ⬳158.]

4. WATERS AND WATER COURSES ⬳158—CONTRACTS LIMITING DIVERSION—CONSIDERATION.

Where parties having or claiming rights in the water of a river undertook for reasons satisfactory to themselves to compromise and settle their rights, such settlement and compromise was an adequate consideration for an agreement limiting the quantities of water to be claimed by them.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 184, 186–188; Dec. Dig. ⬳158.]

5. WATERS AND WATER COURSES ⬳152—RESTRAINING DIVERSION OF WATER.

The government, like an individual, can appropriate only so much water as it applies to beneficial uses, and can only restrain a diversion which operates to its prejudice.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. §§ 156, 157; Dec. Dig. ⬳152.]

In Equity. Suit by the United States against the West Side Irrigating Company. Decree for complainant.

Francis A. Garrecht, U. S. Atty., of Spokane, Wash., E. W. Burr, Sp. Asst. U. S. Atty., of North Yakima, Wash.

Bogle, Graves, Merritt & Bogle, of Seattle, Wash., for defendant.

RUDKIN, District Judge. The West Side Irrigating Company was organized and created under the laws of the territory of Washington on the 5th day of June, 1889, for the purpose of constructing ditches and flumes to convey water from the Yakima river to irrigate lands and water stock in the West Kittitas valley, Kittitas county, Washington Territory. The original incorporators and stockholders were farmers owning lands under the line of the proposed canal, whose chief object was to obtain a supply of water to irrigate their farms and for stock and domestic purposes. The corporation thus formed has no income and pays no dividends. Each stockholder is entitled to divert and use the water conducted through the canal in proportion to the amount of his capital stock, and contributes to the expense of maintaining and repairing the canal in the like proportion. In other words, the corporation is a mere agency to construct, maintain, and repair the canal, and to conduct and distribute water through the same for the use and benefit of its stockholders. Construction work on the canal

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

commenced immediately after the incorporation, and was completed within a couple of years thereafter; but the ditch has been cleaned and repaired, and no doubt to some extent enlarged, since then. No measurements have ever been made or taken by the defendant company of the volume of water conducted through the canal; but it now claims that it requires 4,000 inches of water, measured according to the system or module employed by it, to properly irrigate the lands underlying the canal and owned by its stockholders.

During the year 1905 the government had under contemplation the construction of storage reservoirs and irrigation works in the Yakima valley under Act Cong. June 17, 1902, c. 1093, 32 Stat. 388 (Comp. St. 1913, §§ 4700–4708), commonly known as the "Reclamation Act," and had withdrawn or appropriated all of the then unappropriated waters of the Yakima river and its tributaries under the act of the Legislature of the state of Washington of March 4, 1905 (Laws 1905, p. 180), entitled, "An act relating to the appropriation of waters of the state for irrigation purposes, granting to the United States the right to exercise the power of eminent domain in acquiring lands, water and other property for rights of way, and for reservoirs and other irrigation works, granting to the United States certain rights in state lands and * * * waters of the state, relating to water users' associations, and declaring an emergency." The Secretary of the Interior refused to approve the plan commonly known as "the Tieton and Sunnyside projects," or to enter upon the construction of irrigation works or storage reservoirs in the Yakima valley, except upon compliance with certain conditions among which were the following:

"First. The adjustment of all conflicting claims of those who are appropriating water from the Yakima river or any other body of water, for irrigation power, or any other purpose.

"Second. The determination of all suits now pending to prevent the diversion of water from the Yakima river to the Yakima Indian reservation, and any and all other litigation that in any way tends to embarrass or restrict the appropriation of the waters from said river or any other body of water needed for the irrigation of the lands under said proposed projects."

The attitude of the government was explained to the water users of the Kittitas and Yakima valleys by officers or representatives of the Reclamation Service, and local committees were appointed to obtain a satisfactory settlement and adjustment of all claims to water from the Yakima river and its tributaries to meet the demands and requirements of the Secretary of the Interior. At the instance of one of these committees the defendant company signed the following agreement:

"The West Side Irrigating Company to Public.

"Between the Appropriator Taking Water from the Yakima River and Its Tributaries.

"Whereas, the Reclamation Service of the United States has been requested to investigate the water resources of the Yakima watershed with a view to the further development and increase of irrigation therein, under the provisions of the act of Congress approved June 17, 1902 (32 Stat. 388), known as the Reclamation Act; and whereas, the officers of the Reclamation Service in a preliminary investigation have found that in all the low-water flow of the Yakima river and its tributaries has been appropriated and is now

being diverted by the various canals within said watershed, and that in order to irrigate additional lands within said watershed it will be necessary to store the surplus waters of the flood season; and whereas, no irrigation project to be undertaken by the United States within the said watershed can be recommended as feasible unless the quantity of water to which each present user from the Yakima river and its tributaries is entitled be first definitely ascertained and agreed to; and whereas, the undersigned claim certain quantities of water from the Yakima river and its tributaries, and are willing to limit their claim to the said waters to the quantities of water designated in the following schedule:

Schedule.

Cubic Feet Per Second.

| April to August, inclusive | September | October |
|---|---|---|
| 80 | 80 | 34 |

"Now, therefore, in order to avoid litigation, to encourage the storage of water in the Yakima watershed, and to secure the indirect benefit derived from further irrigation through federal enterprise, each subscriber to this agreement or to a copy thereof, differing only as to the quantities of water specified, agrees to limit and hereby does limit its respective rights of appropriation from said Yakima river and its tributaries to the above-specified amounts: Provided, that it is hereby understood and agreed that the limitation of water rights as herein specified is made as a compromise, in order to secure the benefits above referred to, and shall not bind any party hereto in any event, unless the determination to construct storage and irrigation works by the United States under the Reclamation Act shall be announced by the Secretary of the Interior within two years from the date upon which he is furnished with properly authenticated copies of the agreements of this form duly executed by or on behalf of such proportion of the claimants of the waters of the Yakima river and its tributaries as shall be satisfactory to the Secretary of the Interior.

"In witness whereof, the undersigned has caused these presents to be executed in its corporate name, by its president, and attested by its secretary, and its corporate seal to be affixed, by authority of its board of directors, heretofore duly made and entered this 21st day of October, 1905.

"The West Side Irrigating Company,
"By Mitchell Stevens, Vice President."

The determination to construct storage and irrigation works in the Yakima valley was announced soon after the execution of the above agreement, and well within the two years specified, and the government has expended upwards of $8,000,000 in the construction and maintenance of such works since that time. The present suit was instituted to restrain the defendant from diverting water from the Yakima river in excess of the quantity set forth in this so-called limiting agreement, and the case is now before the court for final hearing on testimony taken before a commissioner appointed for that purpose.

It is conceded throughout the testimony that the defendant has diverted water from the river in excess of 80 cubic feet per second of time, and it asserts the right to do so upon three grounds: First, because the limiting agreement was ultra vires and void; second, because

the water should be measured at the several points where it is diverted from the canal by the different stockholders or users, and not at the intake of the canal, or at least that such was the understanding of the defendant; and, third, that the defendant at all times claimed the right to divert and use 4,000 inches of water measured according to the system or module adopted by it; that it was represented to the defendant that 80 cubic feet per second was the equivalent of the 4,000 inches thus measured, while in truth and in fact the 4,000 inches, as measured by the defendant, is the equivalent of upwards of 90 cubic feet per second; and it is claimed that the difference between the 80 cubic feet per second, measured at the intake, and the 4,000 inches as measured by the defendant at the points of delivery to the different stockholders, is 24.6 cubic feet per second. In other words, the defendant claims and asserts the right to divert from the river 104.6 cubic feet per second, while the government claims that it is limited to 80 cubic feet per second.

[1, 2] 1. The defense of ultra vires, or, more properly speaking, the defense that the execution of this limiting agreement was without the scope of authority of the officers who executed it and authorized its execution, cannot prevail at this time. In the first place, the authority of these officers is not directly challenged by the answer, and want of authority is a special defense, which must be specially pleaded. But in any event, and regardless of the pleadings, all the stockholders had notice of the execution of the contract soon after it was signed, and it then became their imperative duty to either abide by the contract or promptly disavow the unauthorized acts of the corporate officers, and bring notice of such disavowal home to the government, or to some authorized officer of the government. But instead of so doing a called meeting of the stockholders was held on the 2d day of January, 1906, for the purpose of discussing and considering the contract, and after full discussion a motion was adopted "that no action be taken to relinquish any water at the present time." The corporation, its officers, and stockholders maintained a discreet, if not an intentional, silence concerning this action for almost two years, and permitted the government to proceed with its work and with its vast outlay of money in the belief that all water disputes had been settled and adjusted in accordance with its requirements. That the defendant and its stockholders, under these circumstances, should now be estopped to question the authority of the officers or the validity of the contract, does not, in my opinion, admit of question. 10 Cyc. 1076; Indianapolis Rolling Mill v. St. Louis, etc., Rd., 120 U. S. 256, 7 Sup. Ct. 542, 30 L. Ed. 639; Penn. Ry. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371, 381, 9 Sup. Ct. 770, 33 L. Ed. 157; Construction Co. v. Fitzgerald, 137 U. S. 109, 11 Sup. Ct. 36, 34 L. Ed. 608; Augusta, T. & G. R. Co. v. Kittel, 52 Fed. 63, 73, 2 C. C. A. 615.

[3] 2. The contention that the water should be measured at the many points where diverted from the canal for use by the stockholders, instead of at the intake of the canal, where the water is diverted from the river, or that the officers and stockholders of the defendant could have so understood, does not impress me. The question of the settlement and adjustment of the conflicting claims to water from the

Yakima river and its tributaries was under discussion for months. As early as April 1, 1905, the following motion was adopted at a meeting of the stockholders of the defendant company:

"Motion by W. A. Stevens, seconded by J. N. Burch, that the stockholders of the West Side Irrigating Company make claim to the government Reclamation Bureau to 4,000 inches of the waters of the Yakima river, and the board of trustees to notify Splawn and Ellison to make their claims to water to flow through the company's canal, and in case they do not make their claim the board of trustees to claim 1,000 inches for Splawn and Ellison."

It may here be stated by way of explanation that the claims of Splawn and Ellison are in no wise connected with the present claim of the defendant company. The object and purpose of the government was to ascertain and fix the quantity of water diverted from the river, not the quantity actually used for the purpose of irrigation. Water lost by seepage or evaporation while flowing through the canal was as much lost to the government as the water actually used for the purpose of irrigation. True, no doubt, some of the seepage water found its way back into the river; but that is equally true, though perhaps to a less extent, of water actually used for irrigation. But the main point is that the purpose of the government was unquestionably to fix the amount of the diversion at the point of diversion. No man of average intelligence could have understood otherwise, and a reading of the record convinces me that the officers and stockholders of the defendant company measure up to that standard.

[4] 3. The 80 cubic feet per second is conceded to be the equivalent of 4,000 inches measured under a 4-inch pressure, and I feel that I am well within the record in stating that the latter unit has almost become the standard of measurement in the locality in question. Such is the unit prescribed, in numerous decrees of the courts of Kittitas county, extracts from which are appended to the government's brief, and not denied by the defendant. Furthermore, it was testified at the trial that the defendant's module of measurement was the same as that prescribed in one of these decrees. The officers and stockholders of this company are not as ignorant of the ways of the world and of water measurements as they now profess to be. They have lived in the midst of irrigation, and have been surrounded by, if not actually involved in, litigation over water rights, for years. The company had its origin in litigation over the waters flowing in the tributaries of the Yakima river, and its records repeatedly refer to inches of water and other matters showing a general knowledge of water measurements. And, without discussing the subject further, I will only add that the record convinces me that the officers and stockholders of this company are fully competent to understand and appreciate their rights and abundantly able to protect them.

Furthermore, the purpose of this agreement was not to fix or establish existing rights, but to fix and prescribe the rights which the defendant company would have and exercise in the future. The defendant was under no obligation to sign the agreement or to relinquish any rights it might have, and the government was under no obligation to take up irrigation works in the Yakima valley. Both parties, how-

ever, had or claimed rights in the waters of the river, and they undertook for reasons satisfactory to themselves to compromise and settle these rights. This settlement and compromise was an adequate consideration for their agreement, and their course was in full accord with the policy of the law. Such an agreement should not be set aside, except for cogent reasons, established by clear and convincing proof. I know that promises made in aid of public improvements are lightly made and lightly regarded, and are too often followed by repentance and repudiation; but this does not detract from their legal obligation, or relieve courts of the necessity of enforcing them in a proper case.

[5] For the reasons thus stated, I am satisfied that the plaintiff is entitled to the relief prayed for in the complaint whenever the diversion of a greater quantity of water from the river will interfere with or prejudice the rights of the government. But as said in a recent case pending in this court:

"The government, like an individual, can appropriate only so much water as it applies to beneficial uses, and can only restrain a diversion which operates to its prejudice." U. S. v. Union Gap Irrigation Co. (D. C.) 209 Fed. 274.

In that case a diversion after the 1st of July of each year was. restrained; the court finding that prior to that time no prejudice would result to the government. It may be that in exceptional years the date thus fixed will be too late; but the decree should be definite and certain, and probably that date could be fixed upon arbitrarily, the court reserving the right to modify the decree whenever exceptional circumstances require a modification. This question can be determined, however, when the final decree is submitted for the approval of the court.

Let a decree be prepared accordingly.