FIRST NAT. BANK OF HAILEY v. G. V. B. MIN. CO.

(Circuit Court, D. Idaho. June 1, 1898.)

1. CORPORATIONS—CONTRACTS BY MANAGING OFFICERS—VALIDITY.

The president of a New York corporation owning mines in Idaho, who was authorized by the by-laws to sign obligations of the company, with another stockholder, the two owning nearly all the stock, took full charge and management of the business in Idaho, which they conducted for four years, during which time no meeting of either directors or stockholders was held. During his management the president at different times executed notes, in the name of the corporation, which were paid without objection. *Held,* that notes so executed to a bank for borrowed money, which was placed to the credit of the corporation, and drawn out upon its checks, which notes were recognized by the successors in interest of the managers for two years, during which time payments were made thereon, were valid and binding obligations of the corporation.

2. SAME—ESTOPPEL TO DENY AUTHORITY OF OFFICERS.

Where the chief officers of a corporation are in reality its owners, holding nearly all of its stock, and are permitted to manage the business by the directors, who are only interested nominally or to a small extent,

and are controlled entirely by the officers, the acts of such officers are binding on the corporation, which cannot escape liability as to third persons dealing with it in good faith on the pretense that such acts were ultra vires.

3. BANKS—LOAN TO CORPORATION—DIVERSION OF PROCEEDS.

A bank which discounts notes of a corporation depositor, and places the proceeds to the credit of the corporation, upon whose checks they are drawn out in the regular course of business, cannot be required to know that such proceeds are properly applied to the uses of the corporation; and the fact that a portion of such proceeds is not so applied will not invalidate the notes where the bank was not in collusion as to the diversion.

4. CORPORATION—MORTGAGE—ESTOPPEL TO DENY VALIDITY.

Where the property and business of a New York corporation was in Idaho, and was there managed for a number of years by the president, without interference or objection by the directors, a mortgage executed during such time by the president on property of the corporation in Idaho, to secure an indebtedness there created in the conduct of the business, is valid and binding on the corporation.

5. SAME—SEAL.

It is not essential to the validity of a mortgage given by a corporation that the corporate seal should be affixed.

6. SAME—CONSENT OF STOCKHOLDERS.

Under the New York statute which, to authorize the mortgage of realty by a corporation, requires that the written consent of the stockholders owning at least two-thirds of the stock should be filed with the clerk of the county where the realty is situated, the essential thing is the assent of the owners of two-thirds of the stock; and, where that is shown, the validity of a mortgage of which the corporation has had the benefit will be upheld, though such assent was not manifested in the statutory way.

This is a suit in equity for the foreclosure of a mortgage.

Lyttleton Price, for plaintiff.
A. F. Montandon, for defendant.

BEATTY, District Judge. The defendant, on June 1, 1895, by G. V. Bryan, its superintendent, executed to plaintiff two notes, aggregating $6,500, to secure which, defendant, by said Bryan, as its president, on June 12, 1895, executed its mortgage, which was assented to by G. W. Venable, as a stockholder of defendant, by his indorsement thereon. To this action, commenced for the collection of the notes and the foreclosure of the mortgage, the defense is interposed that the notes were not authorized by the defendant, and that their proceeds were not used in defendant's business; that the mortgage was not authorized by the defendant; that the corporate seal was not attached thereto, nor was it made according to the law of the state of New York, where defendant was incorporated. The transactions of the defendant and of those associated with it present a peculiar history. From the very brief record book of its proceedings (which, between the parties, I think, was about all introduced in evidence) it appears that at its organization, in New York City, February, 1891, G. V. Bryan owned three-fourths and George B. Howard one-fourth of the 5,000 shares of its stock, who, with one Donnelly, who was given 1 share to qualify him, constituted the board of trustees, which, after electing Bryan president, Howard secretary, and H. K. Thurber treasurer, and adopting by-laws, adjourned, never to meet again, except on

May 21, 1891, to elect a treasurer pro tem.    Those by-laws provided that "the president shall sign all certificates of stock and bonds, and may sign other obligations of the company"; that he "shall perform all duties required by law, or that are usually performed by the president of a corporation"; also, that "it shall be the privilege of the president and treasurer to have the care and custody of the funds of the company."    Armed with such authority, Bryan and Venable, who together, as stated by Bryan in his testimony, had become the owners of all the stock except 350 shares, proceeded to the company's mines in Idaho, and for over four years managed and controlled them and all the company's business absolutely, without any consultation with the directors or other officers of the company, or any official meetings thereof, during which time the notes and mortgage were executed. The management having involved the property in debt, said Thurber, on July 11, 1895, entered into a contract with Bryan and Venable, by which they agreed to procure an extension of time of payment from defendant's creditors, and that all its property should "be placed under the management, direction, and control of said H. K. Thurber as general manager."    An agreement was then procured from the creditors, including the plaintiff, by which they agreed to extend time of payment of their claims, and to forego legal proceedings against the company, and that said "Thurber was to have full and exclusive charge and control of the property," and to make to the creditors certain payments from the proceeds of his operations.    This contract was twice renewed, and was continued until April, 1897, during which Thurber paid the creditors about 31 per cent. of their claims, and as late as January 18, 1897, by his letter to the plaintiff, proposed to continue such payments.    The next official meeting was of the stockholders held at New York City, on September 16, 1895, at 2 p. m., at which 1,850 shares of stock were voted for directors, but whose or by whom voted does not appear.    This, however, is the same number of shares previously placed in the hands of Aplington and Dean by Venable, as collateral security for a debt of over $70,000 which he owed Thurber. It does not appear certainly who was present at this meeting, but Aplington acted as chairman, and one George E. Field as secretary, and they and Nancy Thurber, who could not have been present, were elected directors.    Immediately upon the adjournment of this meeting, or at 3 p. m. of the same day, and at the same place, a directors' meeting was held, at which were present only said Field and Aplington, who elected themselves chairman and secretary, respectively, of the meeting, and Nancy Thurber president, H. K. Thurber treasurer, general manager, and superintendent, and Aplington secretary, of the company, and thereupon directed that H. K. Thurber, "as such general manager and superintendent," shall have charge of the property of said company, and manage and control the business and mines and property of said company, subject to the president, who was his wife, and the board of directors, composed of his wife, his nephew, Aplington, and Field, neither of whom does it appear was a stockholder. The next official meeting was on February 3, 1897, when Field and Aplington alone met as a board of directors, and authorized a "proposed lease" of all the company's mines and property to Aplington,

which it otherwise appears had already been made by Nancy Thurber, as president, and H. K. Thurber, as treasurer, of the company, on January 1, 1897; and at the same meeting they ratified a prior sale by the president, Nancy Thurber, to Aplington, of all personal property of the company.    February 10, 1897, a directors' meeting was held by Field and Aplington, at which Thurber was appointed resident agent, upon whom legal process could be served.    The same two parties next met as a board of directors on April 7, 1897, and ratified the assignment made on January 1, 1897, by Mrs. Thurber, as president, and H. K. Thurber, as treasurer, of the company, to Aplington, of all royalties arising from certain leases on the company's mines.    On October 6, 1897, a stockholders' meeting was held, at which were chosen John C. Bouton, holding one share, chairman, and Field, secretary, whereupon resolutions were adopted condemning as unauthorized the notes and mortgage in suit, and empowering the president to resist this action, also to "ratify, confirm, and approve" the lease, the sale, and the assignment of royalties to Aplington, above referred to; and then the meeting elected Bouton, Field, and Susan Venable directors. Upon the adjournment of this meeting, a directors' meeting was held, at the same place, at which were present Bouton, Field, and Susan Venable, when new officers were elected, and this closes, the official record history of the company.    While the contract with the creditors to forbear legal proceedings, above referred to, remained in force, Aplington, on January 12, 1897, commenced his action in the state court against the company, service being made upon Thurber, as agent, upon several notes given by him as treasurer at different dates, commencing July 12, 1895, and on January 28, 1897, recovered judgment by default for about $13,000.    To the Pass Mining Company, recently organized in New York, of which the stock was owned by Mrs. Thurber and Aplington, the note of defendant was executed on January 8, 1898, for $2,500, by its new president, Bouton, and Field, as treasurer, upon which action was commenced in the New York court, on January 25, 1898, in which Aplington acted as attorney as well as president of the Pass Company, which action went to judgment by default on February 28, 1898; and upon this judgment the same attorney who has been appearing for the defendant brought action in this court, which went to judgment without any defense interposed.

That Bryan was, until July, 1895, and that H. K. Thurber has been since, the G. V. B. Mining Company, is a conclusion fully justified in this case.    The so-called "directors" and "officers," in New York, constituted simply the dumb machinery, entirely directed by these parties, and through whom they operated when it was necessary to invoke the legal status of the corporation to strengthen their hands or advance their objects.    That parties who have no personal interest in the mission of a corporation can be used as the instruments of its power, to be directed by, and serve as a shield to, reckless and unconscionable operators, opens wide the door to the commission of most vexing frauds, but which, nevertheless, may not be made amenable to the law.    It may be safely asserted that the majority of corporation debts lost by trusting and unsuspicious creditors are chargeable to

corporations organized and operated as this has been, wherein none could be held liable except the corporation itself, which is but a shadow. That such can occur is an outrage upon a trusting public, for which the careless legislation of this country is chiefly chargeable. To conclude that there has been no bad faith in the management of defendant's interests would require the exercise of more charity than often obtains in our judgment of human affairs. While it is possible that what was done was the sequence of unforeseen circumstances, which led along step by step to existing results, and while it may have been the intention to finally pay the creditors, it is true that after Thurber took control, which he said he did hoping to save a large claim he had against Venable, while the creditors, relying upon the alluring promise of payment, were forbearing any attempt to collect their claims, transactions were had intending the transfer to Aplington of all the proceeds of the company's mines, including all its personal property, and debts were created in his favor upon which actions were commenced, speedily culminating in unopposed judgments, which bar the way of the creditors in the collection of their debts, and in all of which the subtle and master hand of H. K. Thurber is vis'' le.

1. To the notes, the first defense is that they were not authorized. Were they made under such circumstances that they can be charged to defendant? The home of the company was in New York City. Bryan, who executed them, was not only a large stockholder, but was the chief and managing officer of all the company's business in Idaho. The by-laws authorized him to sign certain documents and "other obligations of the company," and generally he was authorized to do all necessary acts to carry out the objects of the corporation. Prior similar transactions were had with the plaintiff, and settled without objection. From May, 1891, until months after their execution, no meeting of the directors was had, nor were instructions of any kind given him, but he was left with unlimited authority. When the board of directors was reorganized, in September, 1895, Thurber was given, as treasurer, general manager, and superintendent, equally unlimited authority, which he seems to have exercised; and he recognized the validity of these notes by promising to pay and by making payments upon them, and so continued for about two years; and the only objection ever made to them by the company was by a stockholders' meeting on the 6th day of October, 1897. Also, it appears that the proceeds of these notes were by the plaintiff placed to the credit of the defendant, and were paid out upon its checks. The authority which the public may presume is lodged with an officer of a corporation depends much upon the nature of the office, and the character and general objects of the corporation. When any officer is given general authority to manage its business, and especially when he is one of its chief officers, his presumed authority is extended to include any act that can be necessary in the conduct of its business, or that can tend to the promotion of its objects. This presumption of authority is increased when such officer is managing the business at a place remote from the home or the chief office of the corporation. Any act by a corporate officer inuring to the advantage of the corpora-

tion, or the benefit of which it receives and appropriates without objection or disaffirmance, even when it may have been beyond the authority of the officer, binds it. Not only must a corporation, through its directors or managing board, within a reasonable time, disaffirm any contract made by any of its officers beyond the limits of their authority, but it is so much the duty of such board to know what its officers do that ignorance thereof cannot be urged as a justification for failure to disaffirm. That like prior transactions have passed unchallenged justifies a presumption of authority in the officer making them. In consideration of the manner in which corporations are now largely organized and operated, strength is added to these presumptions. Probably the majority of those organized in recent years are for the purpose of operating some small mercantile, mining, or other pursuit, in which a very few interested parties constitute the chief officers who manage the business; while a few parties, often having little, if any, interest in its affairs, constitute the managing board, and in law the corporation, but in fact are merely perfunctory officials, who, instead of managing, are managed. Such corporations should be dealt with as they deal with the public. The acts of their chief officers who manage the business, and are permitted to do so by their "decoy" directors, should be deemed the acts of the corporation. It would be monstrous to permit escape from responsibility in such cases by the pretense that such acts are ultra vires.

In Pennsylvania R. Co. v. Keokuk & H. Bridge Co., 131 U. S. 371, 381, 9 Sup. Ct. 770, the objection was made that a certain contract made by an officer of the company was not authorized, and that the contract was beyond the scope of its corporate powers. The court says:

"When the president of a corporation executes in its behalf, and within the scope of its charter, a contract which requires the concurrence of the board of directors, and the board, knowing that he has done so, does not dissent within a reasonable time, it will be presumed to have ratified his act. * * * And when a contract is made by any agent of a corporation in its behalf, and for a purpose authorized by its charter, and the corporation receives the benefit of the contract without objection, it may be presumed to have authorized or ratified the contract of its agent."

In Indianapolis Rolling Mill v. St. Louis, Ft. S. & W. R. Co., 120 U. S. 259, 7 Sup. Ct. 542, it is said:

"The rule of law upon the subject of the disaffirmance or ratification of the acts of an agent required that, if they had the right to disaffirm it, they should do it promptly, and, if after a reasonable time they did not so disaffirm it, a ratification would be presumed."

And it was further held that an attempt at disaffirmance in six months after the act was too late.

In Martin v. Webb, 110 U. S. 15, 3 Sup. Ct. 428, concerning a bank officer, it is said:

"When, during a series of years or in numerous business transactions, he has been permitted, without objection and in his official capacity, to pursue a particular course of conduct, it may be presumed, as between the bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations. Directors

cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. * * * That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified, by the circumstances, in dealing with its officers upon the basis of that course of business."

See, also, Construction Co. v. Fitzgerald, 137 U. S. 99, 11 Sup. Ct. 36; Poole v. Association, 30 Fed. 513; Gold Min. Co. v. National Bank, 96 U. S. 640; Railway Co. v. Sidell, 14 C. C. A. 477, 67 Fed. 464; Railroad Co. v. Sidell, 13 C. C. A. 308, 66 Fed. 27; Union Gold Min. Co. v. Rocky Mt. Nat. Bank, 2 Colo. 257; Illinois Trust & Sav. Bank v. Pacific Ry. Co. (Cal.) 49 Pac. 198; Lady Washington Consol. Co. v. Wood, 113 Cal. 487, 45 Pac. 809; Allen v. Power Co. (Wash.) 43 Pac. 55; Thomp. Corp. §§ 5228, 5303, 6325.

2. The remaining defense to the notes is that they were diverted by Bryan to his individual use. Evidence was permitted to show this, under the assurance of defendant's counsel that he would produce authority holding that where funds were so diverted with the knowledge of the bank, or under such circumstances as would charge it with knowledge, it could not hold the defendant therefor. It is shown that the proceeds of the notes, as before stated, were placed to the credit of defendant, and thereafter drawn out upon its checks; certainly, a part for the payment of its debts, and a part for the payment of Bryan's personal debts, as the bank may have known or suspected, for there was nothing upon the face of the checks to impart more than surmise of this fact. It also appears that Bryan was entitled to a salary of $6,000 per annum from defendant. But it cannot be the law that a bank must so far superintend the affairs of its depositor as to see that the proceeds of his checks, drawn in due form, by any duly-authorized agent, are applied in his business; but, so long as the bank is not in collusion with such agent to defraud the depositor, it may and must honor his drafts and checks when drawn in due form, in the regular course of business. The authority cited by counsel, being Brown v. Pettit (Pa. Sup.) 35 Atl. 865, does not support his contention in this case, for there the bank had permitted a partner to have placed directly to his individual credit the proceeds of partnership paper, which he had discounted at the bank. The notes in this case must be held as lawful claims against the defendant.

3. Is the mortgage valid? It is a general rule that, when there is authority in a corporation to give its notes, the authority to secure them by the mortgage of its property is implied. The laws of New York, under which defendant was incorporated, directly give the authority. Much of what has already been said concerning the authority of corporate agents, and the approval of their acts by failure to disaffirm, and many of the authorities already cited are applicable to this question, but to them are added Railroad Co. v. Kittel, 2 C. C. A. 615, 52 Fed. 63, 73, from which it appears that the president of a railroad company gave a mortgage on the company's lands; that, while there was a resolution of record authorizing him to do so, it was disputed that the resolution was authorized; but it was held:

"That as Kittel loaned his money and took the mortgages in good faith, as the company had the benefit of the same, as the directors and officers of the company, by permitting Blake, president, to manage and control the affairs of the company without oversight and scrutiny, and by neglect of their duties and responsibilities, enabled Blake and Bailey to deceive Kittel, if he was deceived, and as the directors and officers, after discovering the loan by a mortgage to Kittel, failed to take prompt action of disaffirmance, and otherwise were guilty of laches, the transactions had between Kittel and the company should be treated as fully ratified on the part of the company."

By Thayer v. Mill Co. (Or.) 51 Pac. 202, it appears that the directors of a corporation, which owned a sawmill and store and a portion of the town site at a place where they were situated, which was at a distance from the office of the company and the residence of all its officers and directors, appointed a general manager, "with full power to manage and conduct the business of the corporation." Such manager conducted the business for some two years, buying logs, and manufacturing them into lumber, which he sold, hiring and discharging the men, selling town lots, and receiving and disbursing the proceeds of the business. Held, that such manager had authority to execute a mortgage in behalf of the corporation on the town lots and logs and lumber at the mill, to secure the payment of indebtedness contracted in the management of the business. See, also, Gribble v. Brewing Co. (Cal.) 34 Pac. 527.

Counsel for defendant, in support of his position that contracts made by officers of a corporation without authority cannot be approved by the corporation directly or by implication, cites Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 24, 11 Sup. Ct. 478, and some similar cases. The fact that by so many decisions that court has announced an apparently contrary rule should serve as a suggestion to counsel of a distinction in the cases, which is simply that when an officer or the corporation itself attempts to make a contract which is not within the powers of the corporation, which is absolutely contrary to law, it is not merely voidable, but void, and cannot be ratified or approved; but when it is one that may be made by the corporation, but is made by an officer without due authority, or when he has not fully complied with the form of the law or the rules of the corporation, when his act is merely tainted with some irregularity, and not repugnant to law, it is only voidable, and may be affirmed or become binding, as before stated. This distinction is several times referred to in the last-cited case, in which, at page 59, 139 U. S., and page 488, 11 Sup. Ct., it is said:

"A contract of a corporation which is ultra vires, in the proper sense,— that is to say, outside the object of its creation, as defined in the law of its organization,—and therefore beyond the powers conferred upon it by the legislature, is not voidable only, but wholly void and of no legal effect. The objection to the contract is not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it. When a corporation is acting within the general scope of the powers conferred upon it by the legislature, the corporation, as well as persons contracting with it, may be estopped to deny that it has complied with the legal formalities which are

prerequisite to its existence, or to its action because such requisites might in fact have been complied with."

4. The corporate seal which was kept in New York was not attached to the mortgage. Undoubtedly, as the law was once held, this omission would defeat the mortgage, but the present prevailing rule justifies the opposite conclusion. 51 Pac. 202, supra, says:

"It was formerly supposed that a corporation could not enter into any contract except by attaching its ordinary corporate seal; but that doctrine originated at a time when the use of seals containing devices significant of the person or corporation to which they belonged was common, and, when affixed to an instrument, they were regarded as equivalent to a signing. Ang. & A. Corp. 215, 216. Under these circumstances, it was, of course, important that a corporation, when executing a contract, should use its common or ordinary seal; and many English and some early American cases seem to hold that the rule still prevails. But it is not the established rule in the courts of this country. It is now settled here that a seal need not be attached to a corporation contract unless a similar contract, when made by an individual, would require a seal; and, when a contract is required to be so executed, a corporation may adopt any seal which is convenient for the occasion, and is not confined solely to the use of its ordinary corporate seal. 1 Mor. Priv. Corp. § 339; 2 Cook, Stock, Stockh. & Corp. Law, § 722; 1 Devl. Deeds, § 336; Bank of Middlebury v. Rutland & W. R. Co., 30 Vt. 159; Tenney v. Lumber Co., 43 N. H. 343; Johnston v. Crawley, 25 Ga. 316; Porter v. Railroad Co., 37 Me. 349; Mill Dam Foundry v. Hovey, 21 Pick. 428. If, therefore, we are right in our conclusion that Nelson had power and authority to execute the mortgage in suit, neither the defendant company nor its creators can repudiate it for the want of the regularly adopted corporate seal." Also, Thomp. Corp. pars. 5044, 5045.

5. The statute of New York which authorizes corporations to mortgage their realty requires that the "written assent of the stockholders owning at least two-thirds of the corporate stock of such corporation shall first be filed in the office of the clerk of the county, where the mortgaged property is situated." As this was not done, it is contended that the mortgage is void. Conceding that the law of New York, and not that of Idaho, governs the execution of the mortgage, the question remains whether that statute must be literally followed. It is evident that the object of the statute is the protection of the stockholders by prohibiting the officers of the corporation from mortgaging or incumbering the property without their knowledge and consent; and this provision is simply the means by which it can always be made certain that such consent is given. The stockholders are as fully protected if their consent is given, although manifested in some other way than that directed by the statute. In Wood v. Water-Works, 44 Fed. 147, it is objected that, in the issue of bonds and a mortgage given to secure them, certain provisions of the constitution and laws were not followed; but as the company had notice of the same, and had the benefit thereof, the court overruled the objection; and, in doing so, quoted from the supreme court of Pennsylvania: "That the only object of the prescribed notice of a proposed increase of stock was to give information to the shareholders, and, if they had such knowledge from any source, it was enough." And in another case, where, in foreclosing a mortgage, the defense was made "that the debt was not authorized by a previous meeting and consent of stockholders and directors" required by the constitution

and laws, "the defense was overruled; the court holding that when a corporation has received the benefit of money borrowed on its mortgage, and the stockholders knew of it, and made no objection, within a reasonable time, to the lack of authority in the corporate officers to make the loan, neither the corporation, its stockholders, nor its creditors, can set up such want of authority in a suit on the mortgage." Also in Bank v. Averell, 96 N. Y. 467, it appears that the corporation executed its mortgage to secure money borrowed; that, prior to the execution of the mortgage, the assent of the stockholders owning two-thirds of the stock had not been secured, but was subsequently, and then filed with the wrong authority. "The literal reading of the proviso in the act of 1864 makes the obtaining and filing of the assent of stockholders conditions precedent to the mortgaging of corporate property. The object of the legislature in requiring such assent was the protection of stockholders against improvident, collusive, or unwise acts of the trustees, the governing body of the corporation, in incumbering the corporate property." "The policy of the act of 1864, requiring the assent of stockholders to the mortgaging of corporate property, is carried out by a subsequent as well as by a prior assent; and we think the intent and spirit of the statute permits the validating of a mortgage by an assent subsequent to its execution. Such assent makes the instrument as of the time it is given a valid mortgage. It is the precedent act upon which its validity depends. It would be a matter of form merely to require the execution of a new mortgage in order to give effect to the action of the stockholders." The court further held that, while the consent of the stockholders is the important and essential thing, the filing of such consent is merely subsidiary, and overruled the objection that the filing was not made in the proper county, and in effect held that the filing is unnecessary.

If it then appears that those owning at least two-thirds of the stock assented to this mortgage, although such assent was not manifested in the statutory form, it is sufficient and the mortgage should be held valid. The mortgage was executed by Bryan, as an officer of the company, and, at the request of the plaintiff, Venable, as a stockholder, subscribed thereon his assent, and the plaintiff claims that Bryan and Venable then owned over two-thirds of the stock. H. K. Thurber, in his testimony, introduced a statement which he said was tabulated by him from stock transfers appearing upon the company's stock books, which showed that, at the date of the mortgage, Bryan and Venable owned but 798 shares. For some reason the plaintiff was acting under the impression that Bryan and Venable controlled the stock. There is no question that, at the organization of the company, Bryan owned three-fourths of it. He says that, at the date of the execution of the mortgage, he and Venable owned all but 352 shares, and in repeating this statement he says there could not have been transfers upon the books of the company without his knowledge; also, he says that, as he and Venable controlled the stock, they conducted the business as though it were their own. Venable says that, at the date when the mortgage was executed, he owned 2,150 shares, 1,850 thereof being deposited as collateral security. In the contract of July 11, 1895, entered into between Thur-

ber and Bryan and Venable, it was recited that Bryan and Venable "were the principal stockholders"; and it was provided by the contract that all operations should be subject to their inspection; that any successor to Thurber should be selected by them, and full recognition of them as the controlling factors is made evident by the contract. It is not a sufficient answer that this contract with them was made only for the purpose of procuring a transfer of their possession of the mines, for the possession could at any time be procured through those who controlled the stock, who, according to Thurber's statement, were Dean and Aplington, parties who have, as the record shows, at all times acted in harmony with him. The very clear preponderance of the testimony is that, when the mortgage was executed, Bryan and Venable owned over two-thirds of the stock, and, having assented in writing to the mortgage, it should be held valid. It is therefore concluded and ordered that plaintiff have its judgment for the notes and decree for foreclosure of the mortgage sued upon.