UNION TRUST CO. OF MARYLAND v. CARTER et al.

(Circuit Court, W. D. Virginia. April 14, 1905.)

1. CORPORATIONS—POWERS OF DIRECTORS—VALIDITY OF CHARTER PROVISIONS UNDER VIRGINIA STATUTE.

Under the Virginia Corporation Act of May 21, 1903 (Acts Ex. Sess. 1902–03–04, p. 437, c. 270), which authorizes the stockholders of a corporation formed thereunder to insert in its charter any provision which they deem best for the regulation and conduct of its business, and to define the powers of the corporation, its stockholders and directors, a provision in the charter of a corporation (also inserted in the contracts of subscription and referred to in the certificates of stock) that until a certain date the stockholders should have no right to vote or to participate in the control or management of the corporation or its affairs, but such control and management should be vested solely in the directors therein named, who should have power to do any act which the stockholders might do in the absence of such provision, was valid, and not in conflict with further provisions of the act relating to meetings of stockholders, their powers, etc., which apply only to corporations whose charters do not otherwise provide; and under such provision the directors had power to sell the property of the corporation where that was the principal object of the incorporators in forming the corporation, and the corporation itself was financially unable to develop, or even to hold, the property, which was largely incumbered.

2. SAME—CHARTER LIMITATION OF POWERS OF STOCKHOLDERS.

Under such charter provision, a meeting of the stockholders held before the time limited had expired, and the election thereat of new officers and directors, was in violation of the charter and void.

3. SAME—SALE OF PROPERTY TO DIRECTOR—VALIDITY.

While the sale of the property of a corporation to one of its directors will be closely scrutinized by a court when objected to by a stockholder, it will be upheld where it clearly appears that it was fairly made, and for an adequate price, and was for the best interest of the corporation and its stockholders.

In Equity. On motion for preliminary injunction and for the appointment of receivers.

William H. White, Fielder C. Slingluff, Charles H. Tuttle, Bradley W. Palmer, and Julien T. Davies, for complainant.

John D. Horsley, Mark W. Potter, J. Norman Powell, Edgar H. Gans, James Byrne, and Elihu Root, for defendant Carter.

John D. Horsley and J. S. Lemmon, for Clinchfield Corporation.

GOFF, Circuit Judge. The bill in this cause was filed by the Union Trust Company of Maryland, a corporation organized under the laws of the state of Maryland, a citizen of that state, against George L. Carter, a citizen of the state of Virginia, and a resident of the Western District thereof, and Clinchfield Corporation, a company organized under the laws of the state of Virginia, doing business in said Western District. The complainant, suing as a stockholder of the defendant Clinchfield Corporation, asks the court to set aside a contract alleged to have been made on the 19th day of December, 1904, between that corporation and the defendant Carter, by which, in consideration of the sum of $2,600,000 cash, payable on the 1st day of January, 1906, with a discount at the rate of 6 per cent. if paid earlier, or, in the alternative, for the expenditure of

$500,000 upon the properties of the Clinchfield Corporation, and the giving to it of a certain issue of bonds provided for in the contract; the Clinchfield Corporation sold to the said Carter all of the property and assets owned by it. This contract was authorized and executed by the board of directors of the Clinchfield Corporation, of which board Carter was a member. He, after presenting his proposition to purchase, withdrew from the meeting of the directors, and they then favorably considered his offer, and sold all the properties owned by the Clinchfield Corporation to him. The board of directors consisted of seven members, the other six voting unanimously in favor of making said sale.

The properties of the Clinchfield Corporation so sold consisted of all the stock of the Crane's Nest Coal & Coke Company, a corporation of Virginia, owning a large amount of land in fee simple, as well as the mineral rights connected with other lands. Carter was to take the properties subject to different mortgages on various portions thereof, amounting to $550,000; also all the stock of the South & Western Railway Company, a consolidated corporation of the states of Virginia, Tennessee, and Kentucky, the holdings of which consisted of about 64 miles of railroad in operation, of approximately 80 miles of a partially graded railway bed, and of certain rights of way, which property was to be taken by Carter, subject to a mortgage of $600,000; and all the stock of the South & Western Railway Company, a corporation of North Carolina, whose only property was a franchise; and certain terminal properties, situated at Southport, in the state of North Carolina.

In order to understand the questions involved, and to better appreciate the decision that will be given concerning them, a further description of the properties of the Clinchfield Corporation, and of the circumstances under which that company became the owner thereof, is necessary. On March 6, 1902, Carter, for the purpose of forming a syndicate which would promote the enterprise, gave to the Union Trust Company of Maryland an option of purchasing for $2,368,700 all of the capital stock of certain coal and railroad companies. Payment was to be made by the purchaser assuming incumbrances on the property to the extent of $1,165,000 and by paying $1,203,700 to Carter in cash. After the giving of this option, and before the organization of the Clinchfield Corporation, the coal properties embraced in the option were, with the assent of the parties in interest, consolidated under the name of the Crane's Nest Coal & Coke Company, and the railway properties (except the South & Western Railway of North Carolina) were consolidated under the name of the South & Western Railway. After Carter gave the option mentioned, he, with certain other persons, entered into a syndicate agreement with said Union Trust Company, by which they subscribed $2,368,700 to be paid to said company for the purpose of acquiring the properties described therein, it being understood that the trust company was to act as syndicate manager. It may be well to note here that the property described in the option differed from the property which the Clinchfield Corporation sold to Carter in this respect: Between the date of the

giving of the option and the formation of the Clinchfield Corporation Carter built 26 miles of railroad, and acquired certain terminal property at Southport, N. C., and when the corporation was formed he conveyed said railroad property to the South & Western Railway and the Southport property to the Clinchfield Corporation. It appears that from the time the syndicate was formed until in June, 1904, many attempts to sell the properties mentioned were made, but without success; that negotiations were had with the Seaboard Air Line Railway, and that at one time strong hopes existed on the part of the syndicate that said company would purchase the properties; that efforts were made to sell them to the Southern Railway Company; that thereafter the properties at different times and places had been offered for sale, but that the syndicate had been unable to find a purchaser; that in the meantime the complainant, as syndicate manager, becoming involved, was placed in the hands of a receiver, the result being that some of its subscribers lost confidence in its ability to manage; that a new syndicate was suggested by those in interest, to which the properties should be conveyed, in the hopes that an advantageous sale might then be effected; that a consultation by Carter and those representing him with the syndicate management and those concerned with it took place, with the result that it was agreed that, instead of a new syndicate, a corporation should be formed with additional capital, and that then a further and united effort would be made to either sell or develop the properties. In furtherance of this understanding, the Clinchfield Corporation was incorporated on June 27, 1904, with a maximum authorized capital stock of 30,000 shares of the par value of $100 each. The obligations of each member of the syndicate under the syndicate agreement were exchanged for pro rata subscriptions to the capital stock of said corporation, of which 23,500 shares were issued. To this corporation the properties mentioned formerly held by Carter and then by the Union Trust Company syndicate were conveyed.

The Clinchfield Corporation was organized under the laws of the state of Virginia, the charter thereof having been prepared under the direction of Carter and the subscribers to said syndicate. Among other provisions of the charter is this:

"The subscribers to and holders of the stock of the company, or any of them, * * * shall not, until January the 1st, 1910, be permitted to cast any vote, or participate in any way in the control and management of said corporation and its business, but the entire control and management of said corporation shall be until that date vested in the directors thereof, who shall be the parties whose names are signed thereto."

It was further provided in the charter that the directors "shall have the power to make by-laws, rules and regulations for the government of the corporation and management of its affairs, and to do any and all acts which the stockholders might do, were not their power in this regard vested in the directors." Each share of stock issued by said corporation contained therein this clause:

"By provision of the charter of the Clinchfield Corporation, the holders of the stock thereof have no right to vote in the management and control of its affairs until January the 1st, 1910, except through the action of the directors, as indicated in said provision."

Every subscriber to the stock of the Clinchfield Corporation, including the complainant, signed an agreement which contained these words:

"In accordance with the provisions of the charter authorizing the affairs of said corporation to be controlled and managed by the incorporators and their successors to be chosen by them, until January 1st, 1910, we respectively waive any right we may have to insist upon any organization, annual or other meetings of the stockholders until that day."

The charter also provides that:

"The said directors may at any time obtain the views of the stockholders upon any question, and for that reason may call a meeting of the said stockholders by mailing a notice of the time and place thereof to each person whose name appears on the books of the company as a stockholder, at his last known post-office address, at least ten days before the date of such meeting, which notice shall state the questions upon which it is desired to obtain the views of said stockholders. But the action of said stockholders' meeting shall be advisory merely, and the said directors shall not be bound to approve the same."

Of the stock of the Clinchfield Corporation, 1,300 shares were subscribed for by the Union Trust Company of Maryland, 7,360 shares by George L. Carter, the remaining shares having been taken either by other subscribers of the syndicate or by subsequent applicants. The incorporators and first board of directors were James Clark, Miles White, Jr., J. Southgate Lemmon, A. A. Phlegar, and George L. Carter. At a meeting of the directors on November 10, 1904, their number, under the terms of the charter, was increased from five to seven, Henry H. Kingston and F. J. Lisman then being elected members thereof.

In complainant's bill, it is alleged that on the 16th day of November, 1904, the Union Trust Company of Maryland was the owner of 1,587 shares of the capital stock of the Clinchfield Corporation; that the total number of shares of said corporation issued and outstanding was 23,500; that complainant then owned said shares absolutely in its own right, unincumbered, and unrestricted by any options, pledges, contracts, or agreements of sale; that the property of the Clinchfield Corporation and of its subsidiary corporations was of great value, and that when fully developed it would have an increased value far in excess of the amount of money necessary to develop it; that because of the present values of the properties, and of their great prospective value, that stock of the Clinchfield Corporation was in demand, and was worth more than par to persons who were able and willing to so develop it; that such value arose not only from the present intrinsic worth of the properties, but also because of their strategic position, and was inseparable from the right and power to control the disposition of said properties as an entirety; that the board of directors of said corporation, as it existed prior to the sale to Carter, claimed that its charter divested the stockholders of power to vote their stock, or to change said board, and conferred upon the directors the right to sell all the properties of that corporation without the concurrence of its stockholders, which claim complainant alleges is unwarranted and unfounded in law and in fact; that such powers

so claimed by the directors are contrary to and inconsistent with the statutes of the state of Virginia, and that, if the provisions of said certificate of incorporation have any force and effect whatever, it was that of constituting the board of directors trustees of all the property of the Clinchfield Corporation for the benefit of the stockholders thereof, and that thereby such board assumed extraordinary responsibilities beyond those usually attaching to the directors of corporations, which placed them in a purely fiduciary relation to the stockholders with respect to the property thereof; and that therefore the act of the board in attempting to sell the property of said corporation to one of their own number and in delivering the possession of said properties to Carter was in violation of their duties as directors and as trustees, and voidable at the election of the stockholders of said corporation.

The complainant further shows that said Carter did not, during the negotiations leading up to said contract, or at any time prior to the delivery of the properties to him, disclose to the board of directors all the information which he possessed concerning their great value; that he, knowing the real value of said properties to be greater than the price offered by him for them, entered into a scheme with other parties for the purpose of acquiring the ownership and control of the same, having the intent of combining them with other property, with the object of mining and conveying to market the coal contained therein, thereby making a profit at the expense of the other stockholders of the corporation; that Carter under said contract has obtained possession of the properties of the Clinchfield Corporation at a price far below what they are really worth, and that he, as a director and trustee of the stockholders, had no right to buy said properties for himself and gain any profit thereby, but that the stockholders, as their real owners, should be permitted to retain them and reap the profit themselves; that Carter at the time of said sale was president of the South & Western Railway Company and of the Crane's Nest Coal & Coke Company, and was vice president and general manager of the Clinchfield Corporation; that he had been interested in the properties owned by said companies for many years, and that a large proportion of the first mortgage bonds issued by those companies were held either by him personally or by his friends and business associates; that he possessed much fuller information concerning the values, present and prospective, of the properties of said companies, than did the other directors; that a large majority of the stockholders of the Clinchfield Corporation purchased their stock having reason to believe that a great profit would be realized therefrom, and that no facts or circumstances had come to their knowledge to change this belief, and that the sale to Carter, if allowed to stand, would result in the stockholders obtaining only the money invested by them with the interest thereon, they thereby being deprived of the profits which they had intended to secure to themselves.

The complainant further alleges that upon the execution and delivery of said contract to Carter it protested against the same, and served upon the directors of said Clinchfield Corporation on or

139 F.—46

about the 24th day of December, 1904, certain resolutions, which had, on the 23d day of December, 1904, been duly passed by its executive committee, as follows:

"Whereas, there has been submitted to this committee by the directors of the Clinchfield Corporation what purports to be a contract of sale under date of December 19, 1904, from said corporation to George L. Carter, of the stock of the South & Western Railway Company and the Crane's Nest Coal & Coke Company; and whereas, said alleged sale is, in the judgment of this committee, an improvident and improper one: Resolved, that this committee, on behalf of the company, protests against the same; further resolved, that a copy of this resolution be at once sent to the directors of said corporation through its secretary."

Complainant then shows that the president of said trust company endeavored to associate with himself other stockholders of the Clinchfield Corporation, having the object in view of preventing said contract with Carter from being carried into execution, and that in furtherance of said object certain contracts were prepared and signed by some of the stockholders, whereby options upon their stock were given to said trust company, which then represented H. P. Hollins & Co., a firm of bankers doing business in New York, who agreed to act with said trust company in preventing the consummation of the Carter contract; that it became impracticable to carry out the plan so formed, and that then the complainant was relieved from any and all obligations to sell its stock to said firm, and that prior to the filing of its bill and at the time it was filed the complainant held its stock in the Clinchfield Corporation in its own right, unrestrained by any option, pledge, or contract of sale whatever; that the efforts of complainant to protect its interest in the stock of the Clinchfield Corporation resulted in obtaining the financial assistance of persons who were informed as to the worth of said properties, and who believed that the values thereof were in excess of the sum paid therefor by Carter; that, complainant being financially unable to purchase and hold the properties for the protection of its original holdings, the stockholders of the Clinchfield Corporation were, by the intervention of complainant's president, brought into negotiations with said H. B. Hollins & Co., which firm thereafter agreed to purchase 10,398 shares of the stock of said corporation, which shares, together with those owned by complainant and those of other stockholders acting in harmony with it, constituted a body of stockholders owning together 14,364 shares of the stock of the Clinchfield Corporation, who have renounced and avoided said contract, and who are seeking by means of this suit to protect their said interests; that when the certificates for the stock so purchased by H. B. Hollins & Co. were delivered proxies were obtained from all the former owners and holders of the same, except about 1,000 shares, which entitled the purchaser to vote on said stock at a stockholders' meeting to be held on the 23d day of January, 1905, and that each and all of the stockholders so selling their stock did so with the understanding that said proxies were to be voted at that meeting for a renunciation and avoidance of the Carter contract. Complainant also alleges that on or about the 9th day of January, 1905, and prior to.

the delivery of the properties to Carter, the holders of a majority of the stock of the Clinchfield Corporation, acting through complainant, caused to be served upon the board of directors of that company a notice of the renunciation and avoidance of said contract, and shows that after the service of the notice of disaffirmance the Clinchfield Corporation, acting by its board of directors, in attempting to confirm said contract, turned over and delivered to Carter all of its property, and received in exchange therefor from him about the sum of $2,448,333.33 in cash; that notice of the attempted completion of the sale of said properties and the delivery thereof to Carter was first given to complainant on the evening of the 11th day of January, 1905, after the preparation of the bill of complaint herein, and that prior to that time complainant had exhausted all means at its command to inform itself as to the said action of the directors of the Clinchfield Corporation relating to said contract with Carter.

Complainant alleged that a meeting of the stockholders of the Clinchfield Corporation had been called by the stockholders themselves, under the provisions of the Virginia statute in such case made and provided, to be held in Bristol, Va., on January 23, 1905, to take action on the approval or disapproval of said sale, and for the transaction of such other business as might properly come before it.

Complainant also shows that on or about January 12, 1905, a notice was issued to the stockholders of Clinchfield Corporation by James Clark, as president, and J. S. Lemmon, as secretary, as follows:

"January 12, 1905. The stockholders of Clinchfield Corporation are informed that Mr. George L. Carter, acting under his contract of December 19, 1904, referred to in our circular of December 24, 1904, has elected to pay for the property in cash, and has done so in full. Mr. Carter has, in accordance with the contracts, received possession of the properties."

Complainant further alleges that said trust company, on or about the 29th day of December, 1904, made an offer to the Clinchfield Corporation to purchase all of its properties for the sum of $2,-600,000 in cash, to be paid by said trust company at any time prior to January 1, 1907, the said purchase price to bear interest if not paid prior to January 1, 1906; that said offer was made in the interest of said trust company as a holder of a large amount of stock in the Clinchfield Corporation, and in the interest of other stockholders whom said trust company had at that time joined with itself in the effort to prevent the consummation of the Carter contract; that the answer of the Clinchfield Corporation to said offer in effect was that its properties had already been sold to Carter.

The prayer of the bill is that the contract purporting to be made between the Clinchfield Corporation and George L. Carter, dated December 19, 1904, may be annulled and set aside; that the defendant Clinchfield Corporation be adjudged to return to George L. Carter all moneys, assignments, contracts, and other things of value received by it as consideration for said contract; that the writ of injunction issue, addressed to said Clinchfield Corporation, its offi-

cers and agents, commanding them, and each of them, to refrain from delivering to the defendant Carter any of the property of the Clinchfield Corporation under or by color of authority of said contract, and also addresed to said Carter, and every person claiming by, through, or under him, commanding him and them to refrain from receiving or taking from said Clinchfield Corporation any of its property under or by color of said contract; that a receiver be appointed during the pendency of this action of all the property, real and personal, of the Clinchfield Corporation, such property to be held under the protection of this court, with the power and authority to said receiver to take possession of the stocks of said subsidiary corporations, and cause the same to be transferred to his name as receiver, and to vote thereon with all other power and authority of stockholders, and with the usual powers and duties of a receiver in such cases.

On consideration of the original bill in connection with the exhibits and affidavits filed therewith, the court, upon the 13th day of January, 1905, directed that a restraining order issue; that William F. Donovan and George Blakistone be appointed receivers of each and all of the shares of the South & Western Railway Company and of the Crane's Nest Coal & Coke Company; and it further ordered that the defendants Carter and Clinchfield Corporation show cause on the 30th day of January, 1905, why the writ of injunction should not issue as prayed for in the bill of complaint.

The answers of the Clinchfield Corporation and of George L. Carter were duly filed, together with a large number of affidavits tendered by the complainant and by the defendants. The argument of counsel was heard upon the order to show cause why an injunction should not issue. In connection therewith, the answers mentioned were considered by the court as affidavits, as was the amended and supplemental bill then tendered, which was filed and process ordered to issue thereon.

If, as the defendants claim, the contract between Carter and the Clinchfield Corporation was a fair one, honestly entered into; if Carter, as a director, could legally purchase the property from the board of which he was a member; if the corporation received for its property an adequate consideration; and if the directors, under the circumstances and the law applicable thereto, had the power to sell all of the property of the Clinchfield Corporation—then it will follow that the injunction should be denied, the restraining order be dissolved, and the receivers discharged. It seems that Carter, for a number of years prior to the formation of the syndicate mentioned, had been the owner of the properties in controversy, and that, he being financially unable to hold and develop them himself, sought the assistance of the Union Trust Company of Maryland in an effort to sell or develop them. From March 6, 1902, when his contract with the Union Trust Company was entered into, to June, 1904, repeated efforts had been made to sell the property—a sale of the same having been the main desire of all the parties—but all of such efforts had proven failures. The trust company, in its endeavor to manage the syndicate, had itself

become involved financially, and thereby the burdens of those interested in the property were the heavier because of their connection with that company. The subscribers to the stock of the Clinchfield Corporation, mindful of their recent failure in connection with the trust company syndicate, and desiring to profit, if possible, by that unfortunate experience, unanimously agreed that the charter of that company should contain certain provisions relating to the conduct of its business, the validity of which has been questioned by counsel for complainant; but still, nevertheless, I think that they were authorized by the law, and certainly they were justified by the circumstances then existing. The stockholders had all agreed that they should have no right to vote in the management and control of the affairs of the Clinchfield Corporation until January 1, 1910, except through the action of their directors, who were authorized to do any and all acts that the stockholders might do, were not their powers in that regard vested in the directors. The Virginia statute under which the charter was obtained authorized the stockholders to insert any provision they might deem best for the regulation of the business and the conduct of the affairs of the company, and it also permitted them to insert any agreement they had made defining and regulating the powers of the corporation, as also of the directors and stockholders, provided such agreement was not inconsistent with the requirements of existing laws. The stockholders, by this grant of plenary power to the directors, bound themselves in advance to an affirmance of the acts of the directors; the intention being that the acts of the directors should bind the stockholders the same as if each stockholder had been present at the meeting of the directors and had voted as they did. The stockholders, in order to make this point clear beyond question, all of them, including the complainant, after the incorporation of the company, signed an agreement, the purport of which was to waive any right that they might have to insist upon an organization or to hold an annual or any other meeting until January 1, 1910.

The provisions of the charter referred to are not, in my opinion, in conflict with the legislation mentioned, entitled "An act concerning corporations," which has been in force in Virginia since May 21, 1903. I conclude that section 7, c. 5, p. 457, of that act (Acts Ex. Sess. 1902–04, p. 437, c. 270), which provides for annual meetings of the stockholders, and for meetings by them at any time upon the call of those who hold at least one-tenth of the stock, is intended to apply to those companies in whose charters there is no agreement to the contrary; and I think that section 10 of said chapter means that the board of directors shall be under the regulation of the stockholders if no consent has been given in the charter by the stockholders for the directors to have the exclusive management. If this is not the proper construction of that act, then the provision that the charter may contain the assent of the stockholders for the directors to do certain things exclusively would have no meaning, and would be ineffective.

I am impelled to the conclusion that complainant's insistence that the directors of the Clinchfield Corporation had no power to

dispose of the properties of that company is without merit. This conclusion is in harmony with the views held by and the advice given to the complainant down to the time of the sale to Carter, for complainant not only endeavored to sell all of the properties through the medium of the directors, but also sought to purchase them in a like way for purposes of its own. The complainant must, as must all the other stockholders, submit to and be governed by the charter of the Clinchfield Corporation, which it and they under the statute established as the law for the guidance of that company. So far as this case is concerned, the original stockholders—those who made the agreements mentioned, and who applied for and secured the charter referred to—are the stockholders who, through the directors of their choice, sold the properties of the company to Carter; and surely in a court of conscience they should not complain when required, at least as between themselves, to respect their own promises and observe the requirements of the law made by themselves.

The weight of the testimony is decidedly in favor of the fairness of the contract. When the properties were placed in the hands of the trust company as syndicate manager, it certainly was the intention of all the parties interested in them that they should be sold, and not held for development. That this was Carter's intention, that it was also the wish of the subscribers to the syndicate stock, as well as the desire of the complainant, is beyond question. That the failure of the syndicate management in this particular was a great disappointment to all of the parties is equally apparent. It appears from the report made by a committee appointed to investigate the syndicate that its management made no effort to operate the properties until after it had been ascertained that the prompt sale which was desired could not be accomplished. If it had been the intention of the syndicate to work and develop the property, a working capital would most undoubtedly have been provided, whereas the fact is that a sum sufficient only to pay the liens upon the property and the purchase money due for it was arranged for. I can reach no other conclusion from the evidence than that the idea of the syndicate subscribers was not to hold and operate the properties, but to make as early a sale thereof as might be practicable. That the syndicate was unfortunate, and that its management did not measure up to the expectations of those doing business with it, is not denied; and it is quite clear that it was because of the deplorable conditions existing from the syndicate's failure, and its inability to dispose of the property, that the suggestion was made for the organization of the Clinchfield Corporation for the purpose not only of selling the properties, but also to protect them, and, if necessary, develop them, until the opportunity to sell should come. The value placed upon the properties now by the complainant shows a marvelous increase over the estimate placed upon them by the trust company when, as syndicate manager, it was endeavoring to sell them to whoever could be induced to buy, during the time when the property was notoriously on the market, and when it was always found to be unsalable, although

then, as now, it was claimed that it had a great present and prospective value. The difficulties of the embarrassing situation were materially augmented soon after the organization of the Clinchfield Corporation, when the directors were faithfully attempting to dispose of the properties, by the unexpected and aggressive action of certain active and determined competitors, who were endeavoring to take and appropriate to their own use certain valuable and necessary rights of way which were absolutely essential to the successful operation of the railway portion of said properties. To meet this situation, and to provide for a floating debt, which was continuously increasing, the stockholders found to their dismay that a large sum of money would have to be provided for at once. The discouragement existing at this time among those interested in the properties was not only great, but was also universal, producing among the stockholders an earnest desire not only to sell, but to sell at once. It was about this time that the two new and additional members of the board of directors were elected—Mr. Kingston, of Philadelphia, and Mr. Lisman, of New York. At a meeting of the board held on December 9, 1904, a communication from the complainant was laid before it, from which it appears that the indebtedness of the syndicate calculated to December 15, 1904, amounted to $788,386. At this meeting director Lisman made a proposition for the purchase of the railway properties, and director Carter submitted an offer for both the coal and railway properties. I am unable to find that Mr. Carter made any misstatement to the directors, or withheld from them any facts within his knowledge prior to the sale which he should have disclosed. That he always entertained and expressed a high appreciation of the value of the properties is conceded by all, and shown by his conduct in connection with them. He, as well as all those who subscribed to the syndicate stock, believed that the properties were valuable, but he and they knew that it would require the expenditure of a large sum of money to render them remunerative. He and they knew that, if this large sum of money was not secured, the properties would not only remain dormant, but that the money they had already paid for them would likely be lost. The reports of mining experts, and of parties who had been long acquainted with the properties, and who had carefully examined them, demonstrated the wonderful richness of the great coal beds found under the lands, if only a few millions of dollars could be expended in developing the wilderness where this wealth was entombed. It would be preposterous for any one connected with the syndicate or with the Clinchfield Corporation to insist that they were not fully advised as to the great prospective value of the Clinchfield properties. Mr. Carter, therefore, had he wished so to do, could not have concealed from any one associated with him any knowledge relative to the value of those properties, for had not all the world been told of their fabulous worth, in the efforts that had been made to induce mankind to go and take the treasures there to be found?

It seems that Mr. Carter had several conversations with Mr. Ritter and Mr. Mann about the sale of said properties, and as to

their ability to interest purchasers, among others Blair & Co.; but I am utterly unable to find that prior to the 19th day of December, 1904, when the contract of sale was made with him, he had any understanding with them, or with Blair & Co., or with any other person or company, concerning the purchase of said properties, or that he knew that Blair & Co. could be induced to purchase them, or that Ritter and Mann, or either of them, could render him any assistance in the matter. There is no evidence tending to show that Carter had any negotiations with Blair & Co., either directly or through Ritter or Mann, prior to the 19th day of December, 1904. On the contrary, it is quite plain that it was after the Christmas holidays of 1904 before Mr. Carter had any conversation with any member of the firm of Blair & Co., or with any one who afterwards became associated with him concerning said properties.

The suggestion of complainant that Carter, on December 19, 1904, had some understanding, directly or indirectly, with some of the parties to whom on the 11th day of January, 1905, he sold the property he had purchased from the Clinchfield Corporation, finds no support in the evidence. If I am to believe the testimony on that point—and I see no reason why I should not—then Mr. Carter never met until at least a week after the contract of December the 19th any one of those to whom he afterwards sold the properties. And from the same testimony it is equally as clear that it was not until about the 4th day of January, 1905, that he had the oral understanding with them from which came the contract of January 11, 1905.

The complainant contends that Carter should have advised the directors that previous to the 19th of December, 1904, he had talked with a number of gentlemen of financial character and ability concerning said properties, and that he knew that Ritter and Mann were trying to interest certain persons in their purchase, among others Blair & Co. I am not impressed with the benefit that would have accrued to the Clinchfield Corporation had Carter so advised it, or so told any of its directors. It would have been simply the repetition of an oft-told tale, for since March, 1902, the trust company syndicate and its successor had been negotiating with companies, corporations, and moneyed men of character and ability, and had been endeavoring to sell them said properties. The firm of Blair & Co. had known of the Clinchfield properties for over three years, and at least they had not lacked an opportunity to purchase them. The directors of the Clinchfield Corporation knew that members of the firm of Blair & Co. were directors of the Seaboard Air Line Railway, and it was fair for them to presume that Blair & Co. were well aware of the value of said properties, for they had been offered to and rejected by that railway company. Besides, it does not follow that because Blair & Co. were willing to deal with Carter, and purchase said properties from him, that they would also have dealt with the Clinchfield Corporation. It is not unlikely that they would invest their money in said properties, with Carter largely interested with them, and still have declined to invest when advised that they were not to have the benefit of his

experience and of his management.   It was certainly plain to every director of the Clinchfield Corporation, when Carter submitted to them his offer to purchase, that he would be compelled to procure the assistance of men of wealth in order to hold and develop the properties, for had they not known for some time that it was because of his inability to provide the money himself that he had first sought the aid of the syndicate, and then of the Clinchfield Corporation. They could not presume that he individually would provide the $2,500,000 with which to purchase the property, and then furnish the $6,000,000 stated in their expert's report as necessary to develop it.   The directors of the Clinchfield Corporation, as also the stockholders whom they represented, seemed more anxious to accomplish a sale, and thereby secure the return of their money, than to consider and discover the source from which Mr. Carter expected to obtain the pecuniary assistance he needed.

But is not this discussion of matters that transpired after the 19th day of December, 1904, entirely immaterial to a proper understanding and just decision of this controversy?   Can it be possible that either the directors or the stockholders of the Clinchfield Corporation could, because of any matter presented by the testimony in this case, have canceled the contract of sale made with Carter?   If, when it was executed, it was a valid contract, then its cancellation was possible only with Carter's assent.   After the contract of the 19th of December I think that Carter was justified in concluding that neither the directors nor the stockholders of the Clinchfield Corporation had any right to know from him either his intentions regarding said properties or the names of the parties with whom he conversed or negotiated concerning them.   It was his duty to comply with the terms of the contract, and it was the duty of the directors to require him to do so.

I consider now the argument submitted by complainant, founded on the affidavits relating thereto, that the consideration received by Carter for the properties he had purchased from the Clinchfield Corporation, as set forth in the contract of January 11, 1905, with Ryan, Blair, and others, is evidence that the price paid by him was inadequate and unfair.   I am unable to find from this contract that the properties were of greater value than Carter paid for them.   As I understand it, he virtually sold them at the same price he gave for them.   The parties to whom he sold agreed to pay in cash for the properties the amount that he had obligated himself to pay the Clinchfield Corporation for them, and yet they were receiving from him other property and additional interests than Carter had purchased under his contract of December 19th.   It is true that the contract provided that the properties were to be mortgaged and pledged to secure an issue of $6,000,000 of bonds or notes.   But that, in effect, was what the purchasers of the properties had always been expected to do, in order that a working capital might be provided with which to develop the mines and complete the railroads.   The purchasers from Carter were not to advance the money on the bonds or notes at the time the properties were turned over to them, but only at such times as the corporation afterwards to

be formed should need the proceeds thereof for its corporate purposes. From the proceeds of the bonds, amounting to say $6,000,000, was to be deducted say approximately $2,500,000, which was to be paid to the Clinchfield Corporation in discharge of Carter's obligations to it, and the residue, $3,500,000, was then to be expended in improving and developing the properties. The actual sum of $6,000,000 would then really be invested in the property, which, under such circumstances, it seems to me, as it doubtless did to Carter's vendees, would be ample security for the payment of the bonds or notes so issued; especially so if the properties were to have the careful management that would come from cautious and capable owners.

The Union Trust Company, as syndicate manager, had during the time the properties were under its control received no offer for the same approximating in value the price paid by Carter, and as I understand the proposition submitted by that company on December 29, 1904, its terms were not near so favorable to the stockholders of the Clinchfield Corporation as were those contained in the proposition of Carter, on which the sale of December 19th was based. The directors of the Clinchfield Corporation, all men of high character, of business experience, and of financial responsibility, six in number, who were familiar with all of the properties involved, and fully acquainted with their values, both present and prospective, and also thoroughly informed as to the condition and necessities of the Clinchfield Corporation, after due consideration, and after full consultation with their stockholders, accepted Carter's proposition, selling and delivering the properties to him. The case made by the complainant does not justify me in decreeing that they have acted either improvidently or improperly, but, as I see and understand it, requires me to say that they have done exceedingly well under embarrassing circumstances, and that they are entitled to the commendation of those whose interests they represented and protected.

Under ordinary circumstances there would be force in the argument of counsel for complainant that a board of directors cannot sell all of the property of a corporation. There are, I think, two reasons why the directors of the Clinchfield Corporation could sell all of the property of that company: First, by the provisions of the charter of that company, and with the assent of all the stockholders, the directors were authorized to sell all of its property; second, while it is true that under the law applicable to such matters a corporation during the time it is a going concern, sound financially and able to carry on the business for which it was organized, cannot ordinarily, through its board of directors, dispose of all of its property, still nevertheless it is well settled that a corporation, when in financial distress, and unable to meet its obligations, may, with the consent of a majority of its stockholders, sell all of its property. That the Clinchfield Corporation was at the time of the sale to Carter greatly involved, and unable to meet its liabilities, let alone provide for the expenditures necessary to

keep it a going concern, is fully demonstrated by the affidavits and exhibits filed in this case. All of the stockholders, speaking through the directors by virtue of the charter, recognized this condition of affairs, and not only consented to, but directed, a sale of all the properties of the company. The effect of the provision of the charter thus referred to was to ratify by the stockholders every act of the board of directors not fraudulent in character, such ratification having the same effect as is given to the action of stockholders of companies whose charters have not such provisions, when they meet after the action of the directors and confirm the same.

While Carter, as a director, in one sense occupied a fiduciary relation to the stockholders, he was not a trustee in the technical meaning of that word, and he was not prohibited from purchasing the property of the Clinchfield Corporation, as a trustee is from purchasing at a sale made by him. As a director he was not prohibited by the law from purchasing the property of the Clinchfield Corporation, if the sale to him was authorized by the other six directors of that company, and the transaction was fair, made in good faith, and for an adequate consideration. A court will closely scrutinize such a sale, and the burden of proving good faith and adequate compensation will be placed on the party purchasing under such circumstances. That rule I have not overlooked in the consideration of this case. So far as the acceptance of Carter's offer to purchase was concerned, the Clinchfield Corporation was represented by the other six directors, no one of whom has ever had any interest in the contract made with him. The courts of the United States and many of the courts of the states hold that a contract made between a corporation and a director thereof, under the circumstances shown to have existed in this case, will be upheld, except in instances where actual fraud is proven. I find no evidence of fraud in this case. The stockholders were fully advised as to all material points affecting their interests, and a large majority of them not only approved of the sale to Carter, but insisted that it be made. The remonstrance made by complainant against the sale represented relatively a small number of the shares of stock (stock that had constructively, at least, already consented), and was not mainly because of unfairness and inadequacy of price, for virtually its offer, so far as the amount thereof was concerned, differed but little from the one made by Carter, but was really because its interests would be best subserved by the taking over of the Clinchfield properties by those who now insist that the sale to Carter should be declared void.

In the view that I have taken of the law of this case, it follows that the meeting purporting to be of the stockholders of the Clinchfield Corporation held at Bristol, Va., on the 23d day of January, 1905, was not a legal meeting of said stockholders, and that the parties claiming to be then elected as directors and officers of said company are not the legal representatives of the same, but that the officials thereof acting and in charge of the properties, assets, and

books of said company immediately prior to said 23d day of January, 1905, are still the officers thereof, and should be recognized as such. Therefore the motion made by complainant to strike from the files of this case the answer of the Clinchfield Corporation, verified by James Clark as the president of said company—he being designated as such official in the charter of said corporation—is refused, and the same will remain as the answer of the Clinchfield Corporation to complainant's bill. It follows that the motion to substitute the names of other counsel in the place of those filing said answer will also be denied.

Reaching the conclusion on both the law and the facts that I have indicated, I find myself compelled to direct that the restraining order issued in this cause on the 13th day of January, 1905, be dissolved, that the receivers appointed at the same time be discharged, and that the injunction asked for be refused.

The court at this time does not dispose of the questions raised by the defendants relating to the good faith of the complainant, the Union Trust Company of Maryland, in instituting and prosecuting this suit.