RHEA et al. v. NEWTON et al.

(Circuit Court of Appeals, Eighth Circuit. December 2, 1919.)

No. 5280.

1. CORPORATIONS ☞316(1)—BONA FIDE CONTRACTS WITH OFFICER VALID.

While a contract between a corporation and a director or officer will be closely scrutinized by the courts, it will be upheld if fair and made in good faith, and if no undue advantage was taken of the fiduciary relationship between the parties.

2. CORPORATIONS ☞312(5)—PURCHASE OF PROPERTY OF INSOLVENT CORPORATION BY DIRECTOR DID NOT MAKE HIM TRUSTEE.

Transactions by which stockholders of insolvent mining company, against which actions were pending, transferred their stock under an agreement that the property should be operated for a time by creditors,

---

and if the debts were so paid the stock should be returned, followed by a reorganization and the election of new officers and directors, who, after it had been determined that the property could not be profitably operated in its then condition, sold it in consideration of payment of the company's debts by the purchaser, *held* not to charge the purchaser, a director of the old company, who had no knowledge of the conditions of the transfer, with a trust in favor of such former stockholders.

3. CORPORATIONS ⬦289—ACTS OF DE FACTO OFFICERS VALID.

The acts of de facto officers of a corporation in good faith are as valid as respects third persons as are those of de jure officers.

4. CORPORATIONS ⬦182—STOCKHOLDERS OF INSOLVENT CORPORATION MAY SELL PROPERTY.

When a corporation is insolvent, and unable to meet its obligations, or to secure further funds with which to continue business, and creditors are pressing their claims, a majority of the stockholders have the power, in good faith, to make a sale of the entire corporate property to provide for its debts.

Carland, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Suit in equity by Catherine K. Newton and others against William A. Rhea and others. Decree for complainants, and certain defendants appeal. Reversed.

This is an appeal from a decree holding that appellant Rhea and the Mont B. Mining Company were liable as trustees to account to appellees, who were plaintiffs below, and fixing the amount of the recovery. Two suits were begun, but later they were consolidated and heard and decided as one case. The plaintiff in one suit was Catherine Newton and in the other the plaintiffs were William H. Whitlock and his wife. The defendants were the same in both suits and were the First National Bank of Carthage, Mo., Ernest B. Jacobs, its cashier, William A. Rhea, Mont B. Fairfield, and the Mont B. Mining Company, a corporation.

It was alleged that plaintiff Newton was the owner of 25,000 shares, and that plaintiffs William H. Whitlock and wife were the owners of 24,990 shares, of the capital stock of the Ananias Mining Company, a corporation with an authorized capital stock of 100,000 shares, but which had issued only 87,500 shares; that Rhea owned 25,000 shares, and of the remainder W. F. Webster owned 12,500 shares, E. M. Hall owned 5, and 5 were owned by C. T. Hall; that the Ananias Company owned a mining lease and mining machinery, and carried on mining operations on its land in Jasper county, Mo.; that Rhea was a director, secretary, and treasurer, and managed the mining operations; that the other directors were Whitlock and his wife and the two Halls, but that the Halls were the nominees of Whitlock and Rhea, and as directors conformed to the wishes of Rhea and Whitlock. It was alleged that the Ananias Company became involved in debts that it was unable to meet, and was pressed by its creditors, and that the bank, as one of the creditors, and Jacobs, its cashier, on behalf of the creditors, proposed to the stockholders that they should permit the mining property to be placed in the hands of a trustee, to be held until by its operations it should pay its debts, or be sold by the trustee and the debts paid, after which all remaining money realized by the company's operations was to be returned to the stockholders, and that this arrangement was to be effected by the stockholders assigning and placing their stock in escrow with Jacobs and the bank.

The Whitlocks' bill then alleged that, pursuant to this proposition, they assigned to Jacobs their 24,990 shares of stock, and that Jacobs and the bank accepted the trust. Newton's bill set out copies of letters between Jacobs as cashier, and Newton's attorneys, alleged as defining the terms of the trust

agreement between them. These letters are too extended to be set forth in full, but a portion of the bank's letter making the proposal is as follows:

"At this time it appears that an agreement can be reached among all creditors whereby they will enter into a contract to withhold the prosecution of their claims for a period of 90 days during which time they will place the property in the hands of a trustee, and he will operate the same with an experienced manager, and if within that time, as they confidently expect, the mine can be made to pay, then there will be no reasonable doubt that creditors will receive their money, and the property can be sold at a fair valuation. If this course is not adopted, bankruptcy proceedings will immediately ensue, and the result will be that the creditors will realize but very little upon their various claims, for the largest value of the company lies in its lease and the ground, which will immediately be forfeited by the owners of the land as soon as work is discontinued; such a course would necessarily leave the machinery as the only tangible asset out of which to pay the indebtedness.

"The creditors do not desire to advance the money necessary to put the mine in operation, unless they can feel assured that the stockholders will not interfere, or possibly stop their operations at a time which might be vital to the interest of all concerned, and it is proposed that all stock shall be assigned and placed in escrow in this bank, to be held subject to an agreement, which is to be prepared and accepted by the stockholders, whereby the creditors, after placing the mine upon a paying basis, may have the authority to make a sale of the property in order to pay the indebtedness and save the stockholders something upon their investment. Mr. Whitlock and Mr. Ray, local stockholders of the company, and who own one-half of the capital stock, have agreed to this proposition, and are willing to pool their stock as above indicated. It is also agreed by them that they shall both resign from the board, as well as other local parties and that a new board of directors, composed of the principal creditors, shall be elected in their stead.

"I believe I have outlined the matter sufficiently for you to obtain a fair idea of the situation, and I wish to urge that the stock held by the Newton estate be deposited with Mr. Whitlock's and Mr. Ray's, in order to consummate the plan above referred to. It is the only chance to save anything out of the property, either for creditors or stockholders, and if this course be not carried out and a bankruptcy court be the only resort, creditors will naturally be inclined to take such recourse as may be possible upon the individual liability of stockholders, through irregularities in the corporation, which appear to be numerous, as well as stock which has been unpaid for by various shareholders."

The answer of Mrs. Newton's attorneys contained the following:

"In further reply to yours of April 26th will say that I find that the stock of the Ananias Mining Company, owned by the estate of A. Newton and Catherine E. Newton, is already on deposit with you under certain agreement with Mr. Whitlock. That agreement is hereby canceled, and the stock is placed in your hands in accordance with the request contained in yours of April 26th. We desire to give you full authority to deposit the same in accordance with the wishes of the creditors as set forth in your letter, with this condition, however, that nothing must be done by which the estate of Mr. Newton or Mrs. Newton will become liable for $1 of any indebtedness or obligation whatever. Rather than do that, we would let the entire thing go. Hoping that in the end there will be something left for Mrs. Newton, we have, however, told her to forget all about the stock, and if she receives no return, well and good, and if in the end she does she is just that much better off."

To this letter the bank replied:

"I have neglected earlier replying to your letter of the 1st inst. in relation to the Ananias Mining Company stock owned by the estate of A. Newton and Catherine Newton. I have filed the stock with your instructions attached, and sincerely hope that better results may be reported for the future than the past; but Mr. Whitlock has gotten this company badly involved, and whether or not it can be pulled out of the hole will depend upon various conditions."

In each of the bills it was then alleged that the bank and Jacobs, after accepting the trust, took possession of the property of the Ananias Company and selected Rhea as the manager of the property. The Newton bill alleged that Rhea had full knowledge of the trust. The Whitlock bill alleged that Rhea was selected by Jacobs and the bank as manager of the property for the purpose of carrying out the trust alleged in their bill. In each bill it was averred that Rhea conspired with Jacobs, the bank, and with Mont B. Fairfield to obtain the title to the property, and in order to do so induced a creditor of the Ananias Company, holding a judgment against the Ananias Company, to levy an execution against its property and to sell it, and that at that sale Rhea caused the property to be bid in in the name of Mont B. Fairfield, and that the sheriff thereupon executed a bill of sale for the property to Fairfield. It was alleged that Fairfield conveyed the property to the Mont B. Company, but that this transfer was in breach of the trust. The bills then charged that all creditors of the Ananias Company had been paid out of the proceeds of the trust, but that defendants still retained plaintiffs' shares of stock and the property of the Ananias Company, and had made large profits therefrom. The prayers were for a decree declaring a trust to exist, as alleged, in the property of the Ananias Company, notwithstanding the form of a sale to Fairfield, and for an accounting.

There was a denial by Rhea of the alleged trusts, or of knowledge of them, or of purchase of the property through conspiracy. He alleged that the execution sale was fair and conveyed the title to Mont B. Fairfield, and that the Ananias Company also executed a conveyance of all its property to him; that the Ananias Company was in an insolvent condition, and the stockholders agreed to assign their stock to the creditors, and that the creditors should take the corporation and its property in full payment for their debts, with the right either to sell the corporate property or to continue the corporate existence for their own benefit, and that the property of the corporation and the shares of stock (except those belonging to W. F. Webster) were delivered to the creditors pursuant to this agreement, together with the resignation of the officers and directors, and that the new stockholders elected new directors, who chose new officers for the corporation. He alleged that the Ananias Company, by its new officers, made a written agreement to sell him the property, if he should be able to pay the claims of the creditors; that on the faith of this contract he expended a large amount in improvements on the property and in acquiring new mining ground adjacent to the property of the Ananias Company, from which he procured ores and from the proceeds of their sale was able to pay the debts of the Ananias Company. He alleged that the Mont B. Mining Company since its organization owned and operated the mines, and at its own expense had made extensive improvements and obtained new mining ground and operated mines thereon. The answer of the Mont B. Company was similar. The decree dismissed the suit as to Jacobs, the bank, and Fairfield, but held Rhea to be a trustee for plaintiffs, and ordered him to deliver to plaintiffs certain shares of stock in the Mont B. Mining Company, and to pay to them $183,733.76 as their share of the profits of the trust property. Rhea and the Mont B. Mining Company have appealed. There is some dispute as to the facts, but the essential facts as shown by the evidence are as follows:

In 1910 the Ananias Mining Company was organized under the laws of Missouri, with an authorized capital stock of $100,000, divided into 100,000 shares. Of this stock there was issued to W. A. Rhea 25,000 shares, to W. H. Whitlock 20,000 shares, to his wife, Blanche Whitlock, 4,990 shares, to E. M. Hall 5 shares, and to C. T. Hall 5 shares. Later there were issued 25,000 shares to A. Newton, who afterwards died, and these shares became the property of the plaintiff Catherine K. Newton; 12,500 shares were also issued to W. F. Webster; the remaining 12,500 shares were never issued. The directors were Rhea, the two Whitlocks, and the two Halls. Whitlock was president, and Rhea secretary. The property of the corporation consisted of a mining lease and of a mining or concentrating plant on the leased land. Mining operations were conducted until in April, 1911. At that time the company had an indebtedness of about $23,000, including an overdraft to the First

National Bank of Carthage of $4,600. The value of the property, including leasehold rights, did not exceed $5,000. Creditors were pressing for payment, and suits had been begun. One case was to be heard on April 22d. At a conference between Whitlock and Jacobs at the office of the attorney for the bank on the 21st of April means were discussed for averting the danger from this pending suit, and the bank decided to and did procure an attachment of all the corporate property on the afternoon of the 21st. It is at this conference that Whitlock claims the agreement was made between himself and Jacobs relating to the disposal of his stock in trust to Jacobs. The next day judgments were entered against the Ananias Company for about $4,400 and for the enforcement of liens securing this sum.

The next day was the 23d and on that day there was a general meeting of all the creditors. Mr. Whitlock was not present, but Rhea was. Jacobs explained that the bank attachment was not for the purpose of obtaining a preference, but to hold the property pending some possible arrangement among the creditors. The attorney for Rhea said that Rhea was ready to turn over his stock to the creditors. An attorney for the bank said that he was satisfied that the Whitlocks would transfer their shares, and Mr. Jacobs said he would endeavor to get Mrs. Newton to transfer her shares. The creditors agreed to have an expert examine the mines and report at a later meeting. This second meeting of the creditors occurred two days afterwards, on April 25th, at Webb City. The expert reported it to be doubtful if the mine could be made to pay, but Mr. Rhea said he believed the ground could be made to pay, and it was finally decided that if the creditors would forbear pressing their claims for 90 days, and the stockholders would turn over the property to the creditors, assign their stock, and resign as officers and directors, the creditors would proceed with mining operations, and they agreed who should be chosen as directors. The Whitlocks resigned as directors and officers, and their stock was turned over, assigned in blank to the bank's attorney. The evidence shows this to have occurred on the 25th. Halls' stock was also assigned then, and Rhea assigned his stock an the 25th or 26th. On the 26th a written agreement was drawn and signed by Whitlock for the Ananias Company, and later signed by creditors of the company representing $22,000 of claims, agreeing that Jacobs should act as trustee for the creditors, and that they would forbear legal proceedings for 90 days on the understanding that Jacobs should put some one in charge of the mining operations for 90 days, the proceeds to be paid to creditors. On the 26th also Jacobs wrote the letter to Mrs. Newton's attorneys.

On May 1st. there was a meeting of those claiming to be the stockholders of the Ananias Company, Mr. Hackney holding the Rhea and the Whitlock certificates and one of the Hall certificates, and five creditors having one certificate of 1 share each issued that day as a distribution of the 5 shares previously held by the other Hall, and Mr. Jacobs also acting. Five directors were chosen for the ensuing year. Jacobs was later elected president.

On this same day Mrs. Newton's attorney at Chicago wrote the answer to Jacobs' letter that has been referred to. On May 3d Rhea began work at the mine, thinking to run it for 30 to 90 days on trial, acting as a salaried employé of the new officers of the corporation. On June 15th the Ananias Company, by Jacobs as president, and Rhea entered into a written agreement authorized by the board of directors, by which the company agreed that if Rhea, during the period of his management, should cause all of the debts of the company to be paid, he should thereupon become the owner of all the corporate property, and that Rhea might have the exclusive right to sell the property for the unpaid portion of the corporate debts, and to have as a commission any surplus of price received above the amount of such debts. Jacobs also signed this agreement as trustee representing all the stock in the company, except Webster's shares and the 5 shares issued to directors in order to qualify them. This contract was made after Rhea had reported that he could not profitably operate the mine longer without much new machinery and was ready to quit, but was willing to continue and to put in the machinery at his own expense, if the company would give him such a contract. The directors and creditors were unwilling to purchase the new machinery, and so

the contract was made. Rhea expended between $2,500 and $3,000 for the new machinery. He operated the mine for the remainder of the year, and made unsuccessful efforts to sell the mine. In December he sold the ore which he had held for some time because of low prices, and was able to pay creditors a dividend of 32 per cent.

Soon afterwards Rhea again reported that the mines could not pay and that the ore faces were pinching out. The creditors again appointed an expert miner, who was one of the creditors, to examine the property and report, and he reported that the mine could not be operated so as to pay its debts. The creditors then offered Rhea a discount of 10 per cent. of their claims if he would continue. Rhea associated Fairfield with him, and they acquired additional land under leases, and then decided to exercise the right of purchase of the Ananias Company's property, given him under the option agreement referred to. Supposing that a judgment sale was needed in order to clear the title of the property, because Webster had not assigned his stock, an execution sale on one of the judgments against the corporation was arranged, and the property was bid in on April 1, 1912, by Rhea in Fairfield's name, and the sheriff gave his conveyance to Fairfield. On the same day, the Ananias Company executed a deed to Fairfield of the same property, and Rhea or Fairfield delivered a guaranty of the payment of the remainder of the debts of the company, which amounted to a large sum. These debts were later paid, largely from operations in the mines on other ground and from Rhea's private funds.

A new company was organized, called the Mont B. Mining Company, of which Rhea held practically all the capital stock. To this company the Ananias property was conveyed by Fairfield, and it operated on the land formerly occupied by the Ananias Company, but under a new lease, on more favorable terms, and also on a much larger tract of land adjoining. Owing to the great increase in the prices of zinc and lead ores, these operations later proved to be very profitable. The trial court required Rhea to account for the profits he had made in all of these operations, on the theory that the several mines were but an expansion of the property of the Ananias Company, and that plaintiffs were entitled to such proportion of the shares in the Mont B. Mining Company's stock and in its profits as their shares of stock bore to the total capital of the Ananias Company.

Frank Hagerman and Thomas Hackney, both of Kansas City, Mo., for appellants.

Hiram W. Currey, of Joplin, Mo. (Hugh Dabbs, of Joplin, Mo., and A. W. Martin, on the brief), for appellees.

Before SANBORN and CARLAND, Circuit Judges, and MUNGER, District Judge.

MUNGER, District Judge (after stating the facts as above). The chief question in the case is the sufficiency of the evidence to support the decree. The evidence introduced on behalf of the Whitlocks tended to prove that Jacobs agreed with them that, if they would assign their stock to him as trustee for the creditors, he would put a competent manager in charge of the mine, and endeavor to pay off the corporate debts by the proceeds from the operation of the mine, and then would return the shares of stock to them. The theory of Whitlock's counsel is that this was as far as the agreement extended, and that no power of sale of the mine or of the stock was conferred on Jacobs or the bank, although this militates against the allegations of the bill. The case has been considered upon the evidence, as if the Whitlock bill conformed to this theory. Treating the evidence as proving the agreement of Jacobs to have been as Whitlocks' counsel now contend, and conceding, without deciding, that thereby a trust

was created in the property of the corporation, and also in Whitlocks' shares of stock, a question of fact arises as to what notice Rhea had of this trust agreement, binding him, as a purchaser of the corporate property, to account to Whitlocks.

Conceding, also, without deciding, that the correspondence between Mrs. Newton's attorney and Jacobs created a similar trust in her favor, a similar question of fact arises as to what notice, if any, Rhea had of the agreement between Mrs. Newton and Jacobs, and, if Rhea had no notice, the Mont B. Mining Company cannot be said to have had notice. Rhea was held to account to plaintiffs only because he acquired the property of the Ananias corporation, and from that property he thereafter made profits. Its corporate existence was not continued by him after he acquired its property, and the property acquired was transferred from him to the Mont B. Mining Company.

[1] Was there anything in the relationship of Rhea to the Ananias Company that invalidated his purchase of that company's mining property? He was an employé of the corporation under a verbal contract to operate the mine experimentally, with a view to discovering whether it would be profitable, if operated. His dealings for the purchase of the mine were made with the company's president, approved by the board of directors, and ratified by the holder of more than a majority of the issued capital stock. There is no reasonable question of his good faith toward the company in making his purchase. He did not in any manner represent the corporation in making the sale. That he was making the purchase for himself was not concealed, as the written contract named him as the vendee. The contract is shown to have been fair, and to the benefit of the corporation and of its stockholders. It provided for the payment of all of the debts of the corporation. There was no apparent prospect of development of the mine of the Ananias Company so as to be profitable, but with additional land that Rhea could acquire the property, with its mill, would be of some advantage. It is urged that Rhea was incapacitated to purchase the property because of his office, but this contention cannot be sustained. In the case of Wyman v. Bowman, 127 Fed. 257, 62 C. C. A. 189, this court, by Judge Sanborn, stated the rule as follows:

"In the first place, it is not true, as a general rule, that the directors of a corporation are incompetent to make contracts with themselves as individuals, or that agreements so made may generally be avoided at the suit of creditors or stockholders of the corporation. The only reason why a contract of this character may be set aside in any case is because directors occupy a fiduciary relation to the corporation, and to its creditors and stockholders. This relation is analogous to that of agent to principal, and trustee to cestui que trust; but it is not of so intimate and confidential a character as either of these. Still it is such a relation of trust and confidence that courts scrutinize with jealous care all transactions between directors as officers and as individuals, and require them to be characterized by good faith and the conscientious discharge of official duty. The vice against which they seek to guard them is that the adverse interest of the individuals may overcome the duty of the officials, and induce agreements and transactions detrimental to the corporation, and unduly beneficial to the individuals. Yet in many—probably in most—cases the interest of the directors and officers of the corporation is as

great, and it is often greater, in the welfare and success of the company, than in their individual prosperity. In many cases the prosperity of the individuals is conditioned by the success of the corporation they are managing. There is no sound reason why individuals who are directors of a corporation may not come to its assistance in days of financial distress, may not make their contracts to loan money to it, to receive security from it for repayment, to accept payment of obligations to them, to buy property from, or sell property to, it, or to do any other act beneficial to the corporation, or mutually advantageous to both the corporation and the individuals. The question here under consideration has often been discussed and determined by the courts of this country and of England, and, without entering upon an exhaustive review of the opinions, it may be safely said that these principles have become firmly established both by reason and by authority: Contracts and transactions between individuals and corporations of which they are directors or officers, which are fair, which are made in good faith, which do not secure to the individuals any undue or unjust benefit or advantage, and in which the interest of the individuals and the duty of the officials work in unison for the welfare of the corporation, are valid and enforceable both at law and in equity. Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 590, 23 L. Ed. 328; Hotel Co. v. Wade, 97 U. S. 13, 22, 23, 24 L. Ed. 917; Gould v. Railway Co. (C. C.) 52 Fed. 680, 681; Sutton Mfg. Co. v. Hutchinson, 63 Fed. 496, 11 C. C. A. 320; Holt v. Bennett, 146 Mass. 437 [16 N. E. 5]; Smith v. Lansing, 22 N. Y. 520, 528; Duncomb v. N. Y., etc., R. Co., 88 N. Y. 1, 6, 9; Buell v. Buckingham & Co., 16 Iowa, 284, 291, 293 [85 Am. Dec. 516]; Ashurst's Appeal, 60 Pa. 291, 312, 315; Hallam v. Indianola Hotel Co., 56 Iowa, 178, 9 N. W. 111; Combination Trust Co. v. Weed (C. C.) 2 Fed. 24. 25–27; Gorder v. Plattsmouth Canning Co., 36 Neb. 548, 556, 54 N. W. 830."

Later cases have approved the same rule. Union Trust Co. of Maryland v. Carter (C. C.) 139 Fed. 717; Kessler & Co. v. Ensley Co. (C. C.) 141 Fed. 130; Cowell v. M'Millin, 177 Fed. 25, 100 C. C. A. 443; Howland v. Corn, 232 Fed. 35, 146 C. C. A. 227; In re Eastman Oil Co. (D. C.) 238 Fed. 416.

[2] It is also urged that Rhea had notice of the trust relationship between Whitlocks and Mrs. Newton and Jacobs. Rhea denies any knowledge of the contracts claimed by plaintiffs to have existed. Rhea had assigned his stock without conditions, although Jacobs' letter to Mrs. Newton's attorney stated otherwise. Rhea mistakenly considered that the corporate property had to be conveyed by a judicial sale before he could get a clear title, because Webster had not assigned his stock. Rhea did not see or know of the correspondence between Jacobs and Mrs. Newton's attorneys. He did not know that any of the stock was assigned on any condition, except that it was for the purpose of paying the corporate debts. Without stating the details of evidence relied upon by the appellants and appellees, a careful reading and consideration of all the evidence, and a comparison of it with the contentions made as to its legal effect, leaves the conviction that Rhea was a purchaser of the corporate property in good faith and without notice of any trusteeship by Jacobs as now claimed by appellees, and that the Mont B. Mining Company acquired the property from him, also in good faith and without notice of any right therein claimed by appellees.

[3, 4] Rhea dealt with those who were at least de facto officers. No other persons claimed to act as directors or president. The officers were recognized as such by all who had dealings with the corporation, and plaintiff's counsel conceded at the trial that the cred-

itors had the right to choose a new board of directors to manage the property. The acts of de facto officers in good faith are as valid as respects third persons as are those of de jure officers. 3 Cook on Corps. (7th Ed.) § 713; 2 Thomp. on Corps. (2d Ed.) §§ 1117–1120; Augusta T. & G. R. Co. v. Kittel, 52 Fed. 63, 2 C. C. A. 615. When a corporation is insolvent, and unable to meet its obligations, or to secure further funds with which to continue business, and creditors are pressing their claims, a majority of the stockholders have the power, in good faith, to make a sale of the entire corporate property in order to provide for such debts. 3 Cook on Corps. (7th Ed.) § 670; 3 Thomp. on Corps. (2d Ed.) § 2724; Hayden v. Official Hotel Red Book & Directory Co. (C. C.) 42 Fed. 875; Marks v. Merrill Paper Co., 203 Fed. 16, 123 C. C. A. 380; Skinner v. Smith, 134 N. Y. 240, 31 N. E. 911; Sewell v. East Cape May Beach Co., 50 N. J. Eq. 717, 25 Atl. 929; Phillips v. Providence Steam Engine Co., 21 R. I. 302, 43 Atl. 598, 45 L. R. A. 560; Rothwell v. Robinson, 44 Minn. 538, 47 N. W. 255; Bowditch v. Jackson Co., 76 N. H. 351, 82 Atl. 1014; Sawyer v. Dubuque Printing Co., 77 Iowa, 242, 42 N. W. 300; Price v. Holcomb, 89 Iowa, 123, 56 N. W. 407; Traer v. Lucas Prospecting Co., 124 Iowa, 107, 99 N. W. 290; Treadwell v. Mnfg. Co., 7 Gray (Mass.) 393, 66 Am. Dec. 490; Descombes v. Wood, 91 Mo. 196, 4 S. W. 82, 60 Am. Rep. 239; Common Sense Min. & Mill. Co. v. Taylor, 247 Mo. 1, 152 S. W. 5; Jones on Insolvent Corporations, § 56; Purdy's Beach on Corporations, §§ 830–834.

Rhea purchased this property from the stockholders and board of directors; both they and he acting in good faith, and believing that authority existed for the making of the conveyance, and that it was for the best interests of the corporation and of the creditors that the property should be sold. No other opportunity had been found to dispose of it, and the price was fair. Rhea was justified in believing that the other stockholders who had assigned their stock had made such transfer on the same terms that he had, as a surrender of their office and a surrender of the shares of stock to the creditors, so that they might obtain payment of their claims, either by operation of the mines or by sale of the mining property. As nothing impugns his good faith in making the purchase from the directors and holder of the majority of the stock, neither he nor the Mont B. Mining Company can be held to be a trustee for plaintiffs.

These conclusions render unnecessary a discussion of other questions presented. For the reason stated, the decree will be reversed, with instructions to dismiss the suits.

CARLAND, Circuit Judge, dissents.